## MONARCH MARKING SYSTEM CO. v. DENNISON MFG. CO.

### SAME v. MAY CO.
### Nos. 7146–7149.

Circuit Court of Appeals, Sixth Circuit.
June 3, 1937.

Rehearing Denied Oct. 12, 1937.

Edmund P. Wood, of Cincinnati, Ohio (Truman A. Herron and Wood & Wood, all of Cincinnati, Ohio, and Fay, Oberlin & Fay, of Cleveland, Ohio, on the brief), for Monarch Marking System Co.

Robert Cushman, of Boston, Mass., and Arthur C. Denison, of Cleveland, Ohio (Charles D. Woodberry, of Boston, Mass., Baker, Hostetler, Sidlo & Patterson, of Cleveland, Ohio, and Roberts, Cushman & Woodberry of Boston, Mass., on the brief), for Dennison Mfg. Co. and May Co.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

The Monarch Marking System Company (herein called Monarch) brought suits against Dennison Manufacturing Company (herein called Dennison), as manufacturer, and the May Company, as user, of certain alleged infringing machines. Since the suits involved the same issues and Dennison defended both, by agreement, the cases were tried upon a single record.

Monarch sued as assignee-owner on: (1) Claims 2, 6, 20, 21, 22, 24, and 27 of Tily and Rehfuss patent No. 1,326,806, December 30, 1919; (2) claims 1, 3, 4, and 5 of Kohnle patent No. 1,528,023, March 3, 1925; and (3) claims 1, 2, 3, 5, 17, 18, 19, and 20 of Kohnle patent No. 1,667,810, May 1, 1928. On Kohnle No. 1,528,023, Dennison was sued for contributory infringement only; as to the others, both respondents were sued for direct infringement.

Dennison counterclaimed against Monarch for infringement on claims 1, 2, 3, and 7 to 28, inclusive, of patent to William J. S. Ritscher No. 1,255,640, February 5, 1918, and assigned to it.

The cases were referred to a master who found: The Tily and Rehfuss patent valid as to claims 2, 6, and 27 and infringed by both defendants; the first Kohnle (method) patent valid as to claims 1, 3, 4, and 5 but not infringed; the second Kohnle (machine) patent valid as to claims 1, 2, 3, and 5 but not infringed, and invalid as to 17, 18, 19, and 20. He also found the Ritscher counterclaim patent valid as to claims 1, 10, 14, 19, and 22 to 28, inclusive, and infringed by Monarch.

The District Court confirmed the master's report after overruling all exceptions thereto. It enjoined infringement of claims 2, 6, and 27 of Tily and Rehfuss and ordered an accounting. It dismissed the bill as to the two Kohnle patents; it enjoined infringement of claims 1, 10, 14, 19, 22 to 28, inclusive, of the Ritscher patent and ordered an accounting.

Subsequently to the decree Monarch filed a disclaimer as to claims 17, 18, 19, and 20 of the Kohnle machine patent.

The appeal of Monarch therefore is from that part of the decree finding claims 1, 3, 4, and 5 of the Kohnle method patent and 1, 2, 3, and 5 of the Kohnle machine patent not infringed; and that part thereof finding the Ritscher patent valid and infringed as to all claims in suit.

Dennison and May appealed from so much of the decree as found the Tily patent valid and infringed as to claims 2, 6, and 27; and from the finding that the Kohnle method patent was valid as to claims 1, 3, 4, and 5; and the Kohnle machine patent valid as to claims 1, 2, 3, and 5.

In large department stores marking and attaching price tags to merchandise prior to sale had become burdensome. To do such work by hand was very tedious and costly and the tags so affixed were often easily detached in handling. This was especially true of those pasted or glued on, but it was also true of tags that were pinned on. Moreover, the exposed pin point was destructive to delicate materials and a painful annoyance to those handling the goods. Machine methods had been developed for affixing a tag by the familiar staple, whereby a single piece of fine wire (or in some cases two) was bent to pass through the tag and merchandise at two points and then bent a second time to clamp the material together. Some of the staples were prefashioned with sharp points, others were cut off from a reel of wire and shaped by the machine at the moment of attachment. These latter staples were blunt-pointed and tended to fray the delicate fabrics of silk hosiery, lingerie, and other fine merchandise both at the time of attachment and detachment, and in certain localities, as near the seashore, were susceptible to corrosion. These machines did not eliminate hand work altogether. Each tagging operation required the handling of each piece of merchandise by an operator, but the printing and tagging were automatic after the article, by a very simple motion of the operator, had been placed in position on the machine and the operator had flicked a starting lever which caused the machine to go through one complete revolution before coming to rest.

This was substantially the state of the art prior to 1918. It is now necessary to study somewhat in detail the patents in suit, beginning with—

*Ritscher No. 1,255,640, February 5, 1918.* Ritscher was the oldest patent in suit and the simplest in construction. It was acquired by Dennison as a possible protection against suit for infringement and was used by it as the basis of its counterclaim. The Ritscher machine was a small, hand-operated, hand-powered desk device and its objects, as stated in the specifications, were to provide "a paper pinning machine including automatically operable means for inserting a pin or similar member through two or more pieces of paper, etc., such, for example, as two sheets of letter paper or a sheet of letter paper and a check." A further object was to provide in such a machine "means for automatically feeding pins from a supply of pins into position to be acted upon by the means for inserting successive pins through pieces of paper, etc." The "etc." twice used is defined in line 61 of the specifications as "other material through which a pin is adapted to be inserted."

Ritscher was the first to use a common pin in a mechanical means for fastening thin materials. His device comprises upper and lower dies for clamping the pieces of material to be pinned. The upper die, which is movable, is secured to the lower end of a vertically-reciprocating, hand-propelled plunger and has two recesses corresponding

with ridges in the stationary lower die. The materials to be pinned are inserted between these dies in their open position and are given a curved or corrugated conformation when the upper die is forced down into clamping relationship with the lower. The opposing faces of the dies have a groove extending transversely through the ridges as a pathway for the pin when the dies are brought together. Thus, while materials to be pinned are folded or puckered by the dies, the pin itself having a passageway therethrough, passes without distortion through the folds in the material, fastening them together.

The pins were supplied to the device in a paper roll, or pin strip, adapted to be fed automatically into operative position. The operation was such that neither the pins nor pin strip were impaired, being an advantage since the free part of the pin strip, as well as that occupied by the pins, could be run through rollers which would keep it taut for the pin withdrawal operation. The roll was inserted on one side of the driving mechanism or shuttle, and the pin strip was threaded through feeding rolls, across a V-shaped groove or track for the shuttle and slightly above it, and thence between a second set of rollers on the opposite side of the groove, the rollers being actuated by a dog which engaged a ratchet, on each downward stroke of the plunger. Thus, for each stroke of the plunger, the rollers pulled the pin strip forward sufficiently to bring a fresh pin over the groove and in position for extraction therefrom.

This was accomplished by a reciprocating shuttle moving beneath the pin strip and at right angles to it, along the V-shaped groove or trackway. On its forward stroke, it moved against the head of the pin, then lying in the bottom of the groove, driving it into fastening position. On its backward stroke, its front end was raised automatically, brushing against the under surface of the pin strip in such a way that a T-shaped notch or claw in the forward edge of its upper surface caught the head of the next pin, pulling it from the strip. Disengaged from the strip, the pin fell to the bottom of the groove and into the pathway of the shuttle for the next forward stroke, and insertion.

The reciprocating shuttle was connected by a system of levers with the reciprocating plunger, moving forward with the downward stroke of the latter and backward with its upward. The plunger compressed a spring as it moved downward, so that it was automatically shoved upward when the operator moved his hand.

Thus to use the device, the two sheets of paper or other thin material were laid over the lower die, the plunger was then forced downward, crimping the materials between the dies and simultaneously driving a pin through their folds. The plunger was provided with a hollow space for the reception of a spring whose function was to permit a continued downward movement of the plunger, after the two dies had come together. This usage, it will be noted later in connection with the Kohnle patents, enabled the dies to be brought together without interference to other parts of the machine over materials of varying thickness. The need for this is clear, the operation of the driver for instance is dependent on a full downward stroke of the plunger. It would not act if the plunger brought up against the materials, short of a complete stroke.

We think the evidence conclusively shows that the Ritscher patent involved invention. It was a paper patent but it was operable. Models made after it were successfully operated before the master not only to pin papers together but to pin price tags to merchandise. As indicated in the specifications, it was intended not only to pin papers together, but "other material." Ritscher was entitled to the benefit of the latter use whether he intended it or not. Roberts v. Ryer, 91 U.S. 150, 157; 23 L.Ed. 267; Stearns & Co. v. Russell, 85 F. 218, 229 (C.C.A.6). It is doubtless true that Monarch's Kohnle machine was a better one and more efficient in operation, but that fact does not establish the invalidity of Ritscher. Hildreth v. Mastoras, 257 U.S. 27, 34, 42 S.Ct. 20, 23, 66 L.Ed. 112.

We need not dwell at length upon whether Ritscher was infringed by Monarch. The master found that its claims read literally upon Monarch's Kohnle machine. This finding is supported by the evidence and in fact is hardly controverted.

We fail to find that Ritscher was anticipated by Heyerdahl. Heyerdahl was granted a British patent, No. 29,503, November 5, 1914, upon an application filed December 22, 1913. The application date of Ritscher was March 24, 1913, but Heyerdahl had filed an application in the United States Patent Office on January 30, 1913. This was, of course, earlier than Ritscher's application,

but the Heyerdahl application was forfeited and abandoned and is not proof of prior invention. Interurban Ry. & Terminal Co. v. Westinghouse Electric & Mfg. Co., 186 F. 166 (C.C.A.6). But were Heyerdahl's United States application prior art, we do not find that it anticipates Ritscher.

*Tily and Rehfuss, No. 1,326,806, December 30, 1919.* This was the earliest of the three patents sued on by Monarch and was apparently the first power-operated tagging machine using pins as a fastening medium. It is expedient to study the claims in connection with the specifications to see just what the machine does and how it operates.

It carried a magazine of pins on a pin strip, as did Ritscher, but the mode of withdrawal from the pin strip, which will be taken up later, was different. It also possessed coacting dies for corrugating the material to be pinned together. It differed from Ritscher in that it did not simply pin together paper and materials presented to its fastening mechanism from the outside, but carried within its mechanism, not only the pins but one of the materials to be joined, namely, the tag or paper, bearing the price notation and other matter. These tags or papers were carried in a great roll or magazine, like the pins, and were fed to the dies in synchronized relation, one tag to one pin.

The dies, although independently pivoted, operate like the two parts of a hinge laid out horizontally, and coming together across the surface of one part in the horizontal position. Lying open, the upper faces carry the ridges and recesses which fit together to shape the materials to be fastened. The die nearest the operator was denoted a "holder" since certain types of goods, like one of a pair of stockings, could be fitted around it and the other laid across the top. After the goods had been applied to it, the die was pivoted forward slightly in order to drop the catch which set off the machine through one fastening operation. After being pivoted, the near die was precisely horizontal and stationary with its die surface uppermost. On either edge were side walls across which the merchandise to be tagged was laid. These made a kind of trough and left a space beneath the merchandise and above the die surface for the insertion of one flap of the French ticket which had just been severed from the roll. (A French ticket is a plain strip of paper folded at the middle in the fastening operation over the edge of the article to be

ticketed, one flap being positioned on one side of the article and the other on the other.) Just prior to attachment, one-half of the ticket is fitted into the trough under the merchandise, the other end lying flat on the surface of the second die in its horizontal position. The second die is then propelled in a hinged motion through 180 degrees toward the operator, holding its half of the ticket on to the top of the merchandise. The two parts of the ticket with the merchandise between are thus pressed and corrugated between the dies and the pin is driven in from the side through the folds by way of notches in the ridges of the dies, much as in Ritscher. The specifications say, "In so doing said pin is caused to pass twice through both thicknesses of the tag, through the layers of the stockings between the same, and to be *left with its point embedded in or completely covered by one or more thicknesses of the stocking. * * * The pin point is thus guarded or concealed so that it is not exposed and likely to scratch any one handling the goods.*" (Italics ours.)

The lower die or "holder" is yieldingly supported by a spring similar to the spring in the plunger of Ritscher, and has the function of accommodating different thicknesses of material to be fastened together.

Tag feeding mechanisms are of various kinds. In Tily the tag strip was punctured at intervals with feed holes to receive teeth projecting from the surface of an endless chain conveyor, which furnished a sort of moving bed for the tag strip, in the same plane with the dies in their horizontal position. As the conveyor moved the tag strip forward to the proper position on the dies, a knife severed the tag next to be attached.

The pin feeding mechanism had little resemblance to Ritscher. Here the pin strip was fed up from below across a wheel having slots in the periphery, so spaced that the pins meshed into the slots. The strip advanced as the wheel was turned, and when the foremost pin reached a position at the top of the wheel directly over its axis, the second die was swung over in its hinging motion, and an arm connected therewith forced its teeth down into the paper strip at the topmost slot, and punched the pin clear of the strip causing it to drop to the bottom of the slot, which was a little larger than the head of the pin, whence it was driven through the slot and into the fastening position by a pin driver coming from the side. Thus in Tily, the pin is

transferred from the pin strip to paper fastening position by two plungers, one of which punches and breaks the pin out of the paper strip sidewise and places it in a slot of the wheel, and the other of which then drives the pin endwise from the slotted machine into paper fastening position.

■■ The defenses were: Invalidity and noninfringement. We think the patent was valid. The result accomplished, that is, the pinning of marking tags to merchandise by a continuous operation, was new and useful. It is true that Tily selected the essential elements of his combination, such as the dies for cupping or corrugating the material, and tags to be pinned, the guide slots through the dies as a pathway for the pin, and a rudimentary pin driver from the prior art, but if the result was novel and useful it was. not . unpatentable. Hug v. Lakewood Eng. Co., 7 F.(2d) 98, 99 (C.C. A.6). The actual operation of the Tily machine, on account of the use of the French ticket was somewhat bizarre, and it never achieved any appreciable commercial success and is probably not entitled to a wide range of equivalents. But upon the question of infringement the Master found that its "claims read literally upon the construction of the Dennison machines" and we think this is true.

Of the three claims in issue claim 2 is printed.[1]

Dennison insists that infringement is lacking because it has no "means for supporting a body of material" such as used by Tily. We cannot yield to the proposition. In both devices the material is supported upon the die. It is true that the Tily supporting die is somewhat unusual in shape because it was designed to utilize the "French ticket." But this is not of critical importance.

That part of the decree holding that the Tily and Rehfuss claims in suit are valid and infringed is affirmed.

*Kohnle No. 1,528,023 (Method), March 3, 1925. Kohnle No. 1,667,810 (Machine), May 1, 1928.* The defenses were noninfringement, and in general, invalidity. These patents can best be considered together since the machine patent was "designed to practice the method of securing price-marking tags upon fabric or like mer-

chandise, as set forth in patent No. 1,528,-023." Although it used a different type of tag, the machine had points of similarity to Tily in that it was designed to use huge reels or magazines of tags and pins. Much of its complicated mechanism related to the synchronized operation of the two reels, so that the movement forward, severing and printing of the individual tags, was gauged with the movement forward and extraction from the pin strip of the corresponding pin, to converge with each other in the very precise operations of attachment, anchoring, and concealment. The method and machines for advancing the tags and fastening medium in synchronized relation had been perfected with considerable success by Tily; and by Kohnle in letters patent No. 762,-322; by Meyers letters patent No. 859,320; by Davis letters patent No. 1,048,136, and others, using wire staples.

Our chief concern is with that operation and part of the machine which accomplishes the actual attachment and anchoring and concealment of the pin. The method and machine may be described as follows: After the tag has been printed and severed (and Kohnle uses a single, flat, cardboard tag unlike the doubled French ticket of Tily) it is advanced until it comes to rest beneath a stationary die plate, concavely bowed and suitably formed to coact with a rounded metal "anvil" somewhat similar in appearance to the cap of a fountain pen, disposed at the head of a plunger which moves vertically up from below. The merchandise to be tagged is laid across the anvil by the operator, and a lever or plate tripped by his finger or knuckles almost in the same motion. This causes the plunger to rise, clamping the tag and comes between the concave die and "anvil" into a bowed form, or single corrugation. The plunger actuating the anvil was shell form, being telescopically connected with the plunger rod through a spring which compensated for the continuing motions of the rod after the anvil was raised in compressing the material and tag against the upper die plate. The action was therefore adjusted to materials of different thicknesses, as in Ritscher and Tily. Meanwhile, the pin has been extracted from the strip by a clawlike mechanism, remindful of Ritscher, whence it falls by gravity, through two levels before landing in the pin tube

---

[1] "2. The combination of means for supporting a body of material; means for feeding a strip adjacent said body; and means for inserting a straight pin through the body of material and the strip in a line substantially parallel to the plane of said body."

whose mouth is pointed directly at the tag in its bow shape. The claw and driver are a unit, as in Ritscher, in that they operate as one. However, they operate at different levels, so that two pins are passing through it at all times. The pin strip passes over the claw, which extracts a pin from the pin strip on its backward stroke. On the forward stroke a pin is driven into the tag from the pin tube and the pin which has just been withdrawn from the strip drops by gravity to an intermediate level, riding in a groove on top of the driver itself. On the second backward stroke, it drops into the pin tube ready for insertion, at the same time that another pin is drawn from the pin strip. And on the second forward stroke, it is driven into the tag. In short, instead of one backward stroke, and one forward stroke from strip to tag, as in Ritscher, the Kohnle device requires two backward strokes and two forward for the same accomplishment.

Kohnle uses notches or slots made familiar by Ritscher and Tily for directing the path of the pin through the dies, but the notches are so arranged that the pin is distorted and shaped as it passes through the dies. This distortion is the key to the whole question of anchoring and concealment claimed by Kohnle.

The first notch is at the forward end of the concave surface of the upper die (i. e., next to the mouth of the pin tube and in line with it) and its major function seems to be to start the pin correctly. The anvil is also channeled, not simply as a passway for the pin, but to deflect it upwardly so that it passes through the material and tag a second time, this time from below. The point then strikes the concave surface of the upper die at the back side and is deflected and bent downwardly through the tag a third time. But note, it does not pass through the material a third time. A third, stationary die plate or lip, protrudes at the left between the free edge of the ticket and the merchandise. It has a triple role of supporting the left edge of the tag, of holding it separated from the merchandise; permitting the pin to be passed through the tag only, and of deflecting the point sharply upward, away from the merchandise and into, or in close relation to, the tag on the under side. In this operation, the pin is forced therefore through a curved passageway in the mechanism of the dies by the pin driver and is bent and deflected to the curves of the passageway.

In sequence, the path of the pin therefore from the mouth of the pin tube is through the notch in the forward edge of the upper die, through the tag and material from the upper side, upwardly along the notch in the anvil, through the material and tag from below, downwardly with the surface of the upper die at the back side, through the tag a third time from above at its free end, to the surface of the stationary lip, whence it is bent upwardly into or against the under side of the tag.

We think that this description of the Kohnle patent clearly indicates that its construction sprang from an inventive concept, and we so hold, but because of the shadowing of the prior art (particularly Tily) we think its claims, read in connection with the specifications, should be strictly construed.

Claim 3 [2] of the Kohnle method patent is typical.

If the claim consisted of nothing more than "a method of securing a tag upon pliable material, consisting in placing a pin through the tag and material * * *," it would amount to no more than a method for doing the common-place. But this element is combined with another, "and crimping the point of the pin into the tag." We do not find that combination in the prior art and we cannot say that it did not have utility. Its purpose was to do rapidly what had been done before by hand if done at all and to anchor the pin against accidental withdrawal and to guard its point against pricking the fingers or injuring the merchandise. We think the patent was valid. Cochrane v. Deener, 94 U.S. 780, 24 L.Ed. 139.

*Dennison machines:* The alleged infringing machine of Dennison, like Kohnle and Tily, utilized large rolls of tags and pins. It also possessed an intricate mechanism for co-ordinating their movement, but it differed radically from Kohnle and Tily in handling the pins, in that the pin was not first extracted or withdrawn from the pin strip in one operation and passed through the tag in another, but was forced through,

---

[2] "Claim 3. A method of securing a tag upon pliable material, consisting in passing a pin through the tag and material and crimping the point of the pin into the tag."

and free from, the pin strip and thence through the tag in a single operation which we need not go into.

Our interest is in the mechanism for clamping the tag and material and pinning them together. Dennison had what we consider was the equivalent of the Kohnle pin tube and driver. There were superficial differences due to a slightly different type of pin strip and a different mode of freeing the pin therefrom. It had a plunger with an anvil head, less rounded and more conical in shape than in Kohnle, but essentially the same, and with a notch therethrough in line with the pin tube, and slightly inclined upwardly. It had the stationary die plate above the plunger with a notch in its forward end next to the pin tube. The upper die differed in one respect from Kohnle in that its concave surface was only about half as long and was located at the forward end (i. e., next to the pin tube); the back half was horizontal and uncurved and roughly in a plane with the upper side of the pin as it lay in the pin tube. It had a stationary support beneath the upper die plate, which carried the back end of the tag during the pinning operation, and separated it from the material, but at no time touched the pin, and had therefore no function in deflecting the pin.

We think there are salient differences between the two machines. They use different types of tags. The Kohnle tag was a plain flat piece of cardboard, rectangular and slightly beveled at the corners, as an aid to the feeding mechanism. The Dennison tag was two-ply, being folded and cemented together tightly from the free edges, about $\frac{3}{4}$ of the width of the folded strip, and uncemented, adjacent its folded margin to form a flat tubular pocket along the folded margin, about $\frac{1}{4}$ of the width of the strip. The upper ply of the unsealed tubular portion was punctured with a small round hole, giving access to the flat pocket within. In the exhibits shown, the tags might be of any length, but the proportions across the width of the tag were preserved.

On the Dennison machine, there was a movable member known as a "beak," pivoted above the stationary support (its lower edge being roughly in line with the pin tube) the point of which swung down and opened up the hole in the top ply of the tag, and the lower edge of which had a long slot to guide the moving pin point into the hole or pocket.

The sequence of the path of the point of the pin from the pin tube was first through the notch in the upper die, then from above through both plies of the ticket in the cemented area, through the merchandise from above, then deflected (but not bent) slightly upward along the notch in the anvil, then from the under side back through the material and ticket through both plies, then against the slot in the under side of the "beak" along which it slid through the hole in the top ply of the uncemented area of the ticket, where it came to rest between the two plies in the uncemented portion forming the tubular pocket.

A variant of the "beak" type of the Dennison machine was the so-called "flapper" type. In it the anvil was the same, the upper die had a concave surface at the right next to the pin tube mouth. But the left-hand side, instead of being horizontal was convexly bowed downward in a relation balanced with the concavity, with a notch through its middle in line with the pin tube. The supporting lip at the left, instead of being stationary was pivoted to raise the free left end of the tag (hence the name "flapper") so that the hole in the upper ply came in line with the pin point as it was guided through the notch in the convexity of the upper die surface. The result was the same as in the "beak" type, namely the concealment of the pin point between the two plies of the tubular portion.

A comparison of the Kohnle and Dennison machines shows that in Kohnle the pins were bent greatly beyond the limit of their elasticity during the last portion of their movement so that the removal from the goods becomes difficult, while in the Dennison machines the limits of elasticity of the pins does not appear to be reached. In the Dennison exhibits left with the court, though the pin seems to be under a slight tension while in the tag, it seemed to be due to the stiffness of the tag, for, when removed from it, the pin had no appreciable distortion.

Claim 2[3] of the Kohnle machine patent is typical. Giving to the claims the

---

[3] "Claim 2: In a machine of the character disclosed, opposing dies, one thereof movable for clamping a tag therebetween and formed to give the tag a temporary curved form, said dies grooved to provide a pin receiving way and anvil surfaces for directing a pin through the tag transversely of the curvature thereof

limited construction hereinbefore indicated, we do not think the uncrimped, pocket-concealed pin point of Dennison infringes. In Kohnle the pins were so sharply bent that they could be withdrawn only with difficulty, which was a point of complaint against the use of staples; but Dennison permitted the easy withdrawal of the point without any strain on the fabric. In such a case "that which is not literally within the claim does not infringe." Directoplate Corporation v. Donaldson Lithographing Co., 51 F.(2d) 199, 202 (C.C.A.6).

The decree of the District Court is affirmed.

and crimping the point of the pin into the tag, and means for driving a pin into said way and between said anvil surfaces of said dies, and guide means supporting

an edge of the tag for feeding and sustaining the tag between the dies prior to being clamped by the dies."