**FRANCE MFG. CO. v. JEFFERSON ELECTRIC CO.**

**No. 8121.**

Circuit Court of Appeals, Sixth Circuit.

Sept. 18, 1939.

Arthur C. Denison and Albert R. Teare, both of Cleveland, Ohio (Baker, Hostetler & Patterson, Bates, Golrick & Teare, Arthur C. Denison, Albert H. Bates, and Albert R. Teare, all of Cleveland, Ohio, on the brief), for appellant.

Frank Parker Davis and J. A. Dienner, both of Chicago, Ill. (Frank Parker Davis, John A. Dienner, and Edward C. Grelle, all of Chicago, Ill., and M. B. & H. H. Johnson, of Cleveland, Ohio, on the brief), for appellee.

Before SIMONS, ALLEN, and HAMILTON, Circuit Judges.

HAMILTON, Circuit Judge.

Appellee, Jefferson Electric Company, instituted this action against appellant, France Manufacturing Company, to restrain alleged infringement of mechanical patent No. 1,777,256, applied for July 16, 1928, and issued September 30, 1930, to appellee, assignee of James C. Daley, Edwin G. Goddard and Joseph J. Sola, patentees.

The patent relates to an electric transformer of balanced design and is an improvement on the earlier patent of Daley, et al., No. 1,786,422, of unbalanced design and for which application was filed November 11, 1927, and issued December 30, 1930.

Appellee relies on claims 8, 14 and 19[1]

of the patent which the lower court held valid and infringed.

Farraday was the originator of the transformer. He discovered that if two coils of wire were wound on the same iron or soft steel, magnetic circuit, one primary and the other secondary, and an alternating current passed through the primary, it would induce a like current in the secondary. Disregarding the small loss of energy due to eddy currents and other causes, the voltages of the secondary and primary current may be regarded as in the same ratio as the number of turns of wire on the two coils and the current strength in the two coils as in this same ratio inverted. Hence, if desired to raise the voltage and diminish the current from an alternating current dynamo by 100-fold to save the heat loss in long distance transmission, it is necessary only to introduce a step-up transformer, the secondary of which has about one hundred times as many turns of wire as the primary. At the place where it is to be used the high voltage may be reduced again to any desired extent by employing a device that is the reverse of the step-up transformer. Many inventors have turned their genius to the improvement of the details of Farraday's fundamentally simple device and have developed a transformer with a magnetic core circuit, laminated to reduce eddy currents and with high insulation of the secondary coils from each other and from the primary coils. The mechanical stress and the heating effects during use require careful attention. Differences of phase relations of alternation of the currents form an important part in the field of transformer theory. Various types of connections have been used to meet different problems.

---

[1] 8. In a transformer, the combination of a pair of generally E-shaped core stacks having primary and secondary core portions and central confined and outer enclosing legs, a pair of secondary coils surrounding the central confined legs and enclosed magnetically by said outer legs, a primary coil disposed between said secondary coils, a pair of shunt paths one between the primary coil and each of said secondary coils and each forming a shunt path for shunting the flux from the secondary portions of said core stacks after initial energization of the secondary coils, and a grounded connection between said secondary coils.

14. Transformer means comprising the combination of magnetic core means, primary coil means, secondary coil means, one of said coil means consisting of a plurality of coil parts and the other coil means being disposed between said coil parts and in balanced inductive relation thereto, shunt means disposed between the parts of the plural coil part means and the other coil means for reducing the voltage in the secondary coil means by saturation of the magnetic core, and a ground connection between the coil parts of the plural coil part means.

19. A stationary transformer having a magnetic core, a pair of secondary winding portions, a primary winding disposed between said secondary winding portions, stationary magnetic shunts one between the primary winding and each of said secondary winding portions and a ground connection between the secondary winding portions.

For neon sign work, a step-up transformer is required. The primary, or low voltage winding consists of perhaps a hundred turns of moderately heavy wire. The secondary, or high voltage winding consists of many thousand turns of smaller wire. For a 15,000-volt transformer, the secondary would have approximately 140 times as many turns as the primary. In luminous tube work, contrary to ordinary transformers, good regulation is not desirable as it maintains the voltage almost constant regardless of the current being drawn from the secondary, but poor regulation is necessary and a transformer for use in neon signs should be built in such a way that as more current is drawn from the secondary, the secondary voltage goes down. Such a transformer, connected to a gas discharge tube, soon reaches a condition of equilibrium, since if too great a current is drawn, the voltage goes down to near zero, and the increased current can no longer flow. If a luminous tube were connected across a transformer having good regulation, the current would increase and as it increased, the resistance of the gas would decrease and as a result still more current would flow. In a short time, the current would become so excessive that either the transformer would burn out or the tube be destroyed.

Transformers for use in neon signs are usually made of an extra iron path in the core called a magnetic shunt which acts as a safety valve. As the current in the secondary increases more of the magnetic lines of force are by-passed by this extra shunt and as a result less of the lines link the secondary winding. As the current in the secondary increases, the voltage across it decreases, thus obtaining the poor regulation. The secondary of a transformer used with a neon sign can be short circuited without harm.

The patent in suit relates to a transformer with a magnetic core surrounding and inclosing the electrical windings, and is suitable for neon signs. It is of the compact housing shell type. Its core structure is composed of two stacks of E-shaped stampings, with its primary or low tension windings disposed about the middle of the central leg of the core. Its secondary or high tension windings are of two separately formed coils disposed at the end of the central leg of the core with one on each side of the low tension or primary winding. The outer ends of these coils are the connecting high tension leads to the neon tubing and the inner ends of the coils are connected electrically and also arranged to ground which creates a midpoint ground for the high tension winding.

Magnetic shunts composed of small stacks of laminations placed transversely of the main central and two outer legs of the core structure are located on each side of the primary coil. Small gaps are left at the ends of the shunts tightly filled with non-magnetic material. The arrangement of the transformer is referred to in the art as balanced, which means dividing the secondary windings with the primary between and with two magnetic shunt paths on opposite sides of the primary so as to come between it and each of the secondary coils.

In the prior art, Elihu Thompson was known as the "father" of electric safety grounding because he introduced the grounded secondary in the transformer as a means of saving life. In his patent No. 400,515, issued April 2, 1899, he stated the object of his invention was to construct a device of a self-regulating character resulting in an automatic adjustment or regulation of the current or potential in the coil forming the secondary when the resistance or current in the same varies. He proposed to do this by a combination with one or the other or both currents of the induction coil of an iron core included in the alternating or varying current circuits with parts brought into definite proximity to form a partial magnetic closure of the magnetic circuit of the core of a definite set value, according to the nature of the regulation of current or the potential desired in the induced circuit, such magnetic circuit being formed independently of the magnetic current which threads both coils of the converter. He used magnetic shunts.

It was also known to the art that a ground connection at the midpoint of the secondary was a useful protective measure where the secondary produced high voltage, but this device, when used in an unbalanced transformer, created the hazard of double current when a short circuit occurred and burned out the transformer without injuring the tubes, electrodes or wiring.

In Fessenden's induction coil, patent No. 64,390, issued July 24, 1900, he stated in order to prevent arcing between the primary and secondary coils, each should be grounded on the core. In the General Electric Review, Vol. 20, Issue No. 12, December, 1917, E. D. Treanor of the Transformer Engineering Department of the General

Electric Company, in describing the operation of the series incandescent street lighting circuits with double transformers, explained the location and use of ground connections at mid-point of secondaries in the transformer series to save damage to them or to the wiring and lamps when short circuited.

In Daley and Goddard No. 1,786,422, of which appellee's device is an alleged improvement, there is shown a single primary coil surrounding one portion of the magnetic core and two secondary coils around another portion and a shunt between them, with a ground connection from the midpoint of the double secondary. The transformer there described was unbalanced.

The shell type of transformer construction is shown in Stanley's patent No. 428,575, issued May 20, 1890.

The art of building balanced transformers was well developed and generally known as early as 1908. The method of dividing the secondary and placing the primary winding in the division with magnetic shunt paths on the opposite side of the primary so as to come between it and each of the secondary coils was explained by Troy in patent No. 895,914, issued August 11, 1908.

In 1925, the American Transformer Company built, and the Fansteel Products Company, of Illinois, had in use at the time of the trial, one 35-KVA high frequency converter with a balanced transformer without a midpoint ground.

In February, 1928, appellant built and sold to Montgomery-Ward Company a low voltage "5-6 ampere dry charger" with a shell type transformer without midpoint grounding but with the primary in the center and a secondary on each side with shunts between and also a leg down the center.

It will be seen from this résumé of earlier patents and prior use that the balanced transformer belonged to the public at the time appellee's assignors applied for their patent and that midpoint grounding for the purpose of cutting in half dangerous voltage was in use in transformers of the unbalanced type.

Neon, one of the gases of the atmosphere, was discovered in 1898 by Ramsey and Travers and is widely used in outdoor advertising signs. Because of its characteristics and the atmospheric conditions and places where used and the appliances necessary for its use, many difficulties were presented in the construction and maintenance of the tubing through which it flowed and the control of electrical current with which it was heated. High initial voltage, which later had to be reduced, was used to break down the gas in the tubes. These problems were not critical in ordinary electrical appliances, including transformers, used for other purposes. At the time appellee's assignors filed their applications, transformers used in neon signs burned out, due to short circuiting across the high tension terminals and electrodes, high tension wires and conduits were destroyed. Damage to the transformers by short circuiting from accidental causes was avoided by heavy insulation, but trouble still developed in wiring and tube connections. The latter difficulty was overcome by using a midpoint ground and then the trouble reverted to the transformer.

From 1922, the beginning of the neon sign industry in the United States, manufacturers of transformers employing highly skilled electrical engineers undertook to devise neon sign board wiring connections and transformers free from the likelihood of damage due to accidental short circuiting in the primary or secondary parts. They discovered that short circuiting damage to equipment could be obviated by the use of larger wire windings in transformers and heavier insulation in leads and tubing, with thicker glass. These improvements added greatly to the expense of the maintenance and construction of the sign. Appellee's assignors solved all these difficulties and reduced costs by devising the balanced transformer, old to the art, assembled with a permanent midpoint connection, which device was generally accepted by the transformer industry. Appellant paid tribute to the novelty and utility of appellee's patent by abandoning their device and putting on the market one embodying every element in each of the three claims here in issue. Diamond Rubber Company v. Consolidated Tire Company, 220 U.S. 428, 441, 31 S.Ct. 444, 55 L.Ed. 527.

The usual presumption of validity arising from the granting of the patent in suit is weakened in this case, because it appears it was without reference to some of the pertinent prior art and uses such as the Troy patent and the earlier uses of the X-ray transformer of the American Transformer Company, and the device of the appellant. American Soda Fountain Company v. Sample, 3 Cir., 130 F. 145; Westinghouse Electric & Mfg. Company v. Toledo Railway Company, 6 Cir., 172 F. 371; Stoody Company v. Mills Alloys, Inc., 9 Cir., 67 F.2d 807.

Appellee's assignors were the first to design a transformer with the midpoint ground placed with a definite relationship to the coils, shunts and core of the transformer, which limited the current in a short circuited coil to substantially no more than normal and limited the free or ungrounded terminal voltage to approximately half of the full voltage. This was a combination of the balanced transformer and the midpoint ground, which had theretofore been used in the unbalanced transformer. This was done by placing old devices in new locations and through combination with other elements old in themselves, which secured a new and useful result, immediately recognized and adopted by the public. It is true that the step taken by them was short, but it had theretofore escaped the skill of the art, although an intensive effort had been made to find it.

■ We are of the opinion the patentees made an improvement of sufficient merit to measure up to the requirements of patentability. Keystone Mfg. Company v. Adams, 151 U.S. 139, 149, 14 S.Ct. 295, 38 L.Ed. 103; Kellogg Switchboard & Supply Company v. Dean Electric Company et al., 6 Cir., 182 F. 991; Bossert Electric Construction Company v. Pratt Chuck Company, 2 Cir., 179 F. 385; General Electric Company v. Bullock Electric Mfg. Company, 6 Cir., 152 F. 427; Ideal Roller & Mfg. Company v. Sutherland Paper Company, 6 Cir., 96 F.2d 675; Thornton v. Coe, App.D.C., 102 F.2d 247; Samson-United Corporation v. Sears, Roebuck & Company, 2 Cir., 103 F.2d 312; In re Bencker, Cust. & Pat. App., 96 F.2d 326; Western Electric Company v. North Electric Company, 6 Cir., 135 F. 79; R. Hoe & Company, Inc., et al. v. Goss Printing Press Company, 2 Cir., 31 F.2d 565; Monarch Marking System Company v. Dennison Mfg. Company, 6 Cir., 92 F.2d 90.

■ The point urged by appellant that patentability of appellee's device cannot be considered in relation to its use with the neon sign is without merit. "The patentee, having described his invention, and shown its principles, and claimed it in that form which most perfectly embodies it, is, in contemplation of law, deemed to claim every form in which his invention may be copied, unless he manifests an intention to disclaim some of these forms." Western Electric Company v. La Rue, 139 U.S. 601, 608, 11 S.Ct. 670, 672, 35 L.Ed. 294; General Electric Company v. Bullock Mfg. Company,

supra; Byers Machine Company v. Keystone Driller Company, 6 Cir., 44 F.2d 283.

■ We have carefully studied the history of the patent in the patent office as shown by the file wrapper which discloses that in the original application a claim was made for a combination of the transformer with neon signs and rejected by the patent office, which resulted in the patentee cancelling this claim. None of the claims in suit, which it is alleged were infringed by appellant, was amended or narrowed by reason of this ruling and all are in the same form as finally presented. They are therefore not to be narrowed or restricted because of the action of the patent office. Permutit Company v. Wadham, 6 Cir., 13 F.2d 454; Goodyear Dental Vulcanite Company v. Davis, 102 U.S. 222, 230, 26 L.Ed. 149; United Chromium, Inc., v. International Silver Company, 2 Cir., 60 F.2d 913; International Cellucotton Products Company v. Sterilek Company, 2 Cir., 94 F.2d 10.

■ We find no merit in the defense of laches. There is no evidence that the delay in instituting suit resulted in injury or prejudice to appellant or that there has been any change in circumstances as the result of such delay as would render it inequitable for appellee to be granted an injunction at this time with damages for past infringement. The statute limits the recovery of profits and damages to those arising from infringement committed within six years prior to the institution of suit (35 U.S.C.A. § 70) and we know of no other period of limitation which may be invoked by an infringer to bar recovery but where circumstances appear which render it inequitable for relief to be granted because of delay in instituting suit, notwithstanding the statute of limitations, relief may be denied on the ground of laches or estoppel. No such circumstances are shown here. It is well-settled that mere delay short of the statutory period of limitation is not sufficient of itself to bar relief. It is no defense to a suit for an injunction and accounting for the continuing trespasses of an infringer that the latter has been trespassing on the rights of the owner of the patent for years with impunity, where he has admitted knowledge of the existence of the patent and notice of his wrong doing. McLean v. Fleming, 96 U.S. 245, 258, 24 L.Ed. 828; Menendez v. Holt, 128 U.S. 514, 525, 9 S.Ct. 143, 32 L.Ed. 526; Hal-

stead v. Grinnan, 152 U.S. 412, 425, 14 S.Ct. 641, 38 L.Ed. 495.

Appellee notified appellant of its infringement June 13, 1931, and thereafter correspondence continued between them on the subject.

At the time appellant was notified of its trespasses appellee had suits pending against other alleged infringers, some of which terminated in licenses, as late as 1935. There is no fact appearing in the case at bar which would lead to the conclusion that any injustice would be done appellant should the relief demanded be granted. There has been no acquiescence by appellee in appellant's contention of patent invalidity. Appellant has been reaping the benefit of appellee's invention and equitable conscience and good faith demand an accounting.

Appellant also insists that appellee's petition should be dismissed because there was a duty resting on it to file a disclaimer as to certain alleged invalid claims in the patent. This contention is based on the ground that at the opening of the trial appellee's counsel made the following statement:

"Whereas mid-point grounding of the windings of transformers was known, in the prior Daley and Goddard patent No. 1,786,422, and whereas the use of a shunt for limiting the current flow which occurs through both coils of the high tension winding was known in the prior Daley and Goddard patent, and whereas a symmetrical relation of coils and shunts was known elsewhere, the particular arrangement of the shunts independently between the primary and each secondary coil, in combination with the mid-point grounding of the secondary winding, produced a device having unique characteristics and capabilities which completely and finally solved the problem of a satisfactory transformer for neon sign service."

This is qualified by further comment of counsel, as follows:

"Mr. Teare: * * * Now the plaintiff's reliance only on claims 8, 14 and 19—the court will observe element No. 10, we find that these three claims are the only ones that have the ground connection between the secondary coils. In other words, the plaintiff has abandoned and admitted that so far as this defendant's construction is concerned, without the ground connection, it is public matter."

"Mr. Davis: Oh, no; nothing of the sort. How do you make it public matter? We simply don't declare on those claims. *We don't abandon them.*"

"Mr. Teare: You abandon them because there is no infringement."

"Mr. Davis: *No, we don't.*"

The lower court declined to rule on claims other than those declared upon. The disclaimer statutes, R.S. §§ 4917, 4922, 35 U.S.C.A. §§ 65, 71, in substance, provide that whenever through inadvertence, accident or mistake, and without any fraudulent or deceptive intention or without any willful default or intent to defraud or mislead the public, a patentee has claimed more than that of which he was the original or first inventor or discoverer, his patent shall be valid for all that part which is truly and justly his own; that any such patentee may on payment of the fee required by law, make a disclaimer of such parts of the thing patented as he shall not choose to claim; that suit for infringement may be brought on that part which is bona fide his own; and that "no patentee shall be entitled to the benefits of this section if he has unreasonably neglected or delayed to enter a disclaimer" of those parts of which he was not the original inventor.

The duty to disclaim begins when knowledge is brought home to the owner of the patent that the inventor upon whose account the patent was granted was not the first to disclose the particular thing claimed in the patent and material to it as a whole. O'Reilly et al. v. Morse, et al., 15 How. 62, 56 U.S. 62, 121, 14 L.Ed. 601. If, however, there is a reasonable ground for difference of opinion as to whether the prior patent, prior use or disclosure so brought home to the knowledge of the patentee or his assignee, really negatives the novelty of anything claimed by him, the duty to disclaim will not arise until that question is judicially determined. Seymour et al. v. McCormick, 19 How. 96, 60 U.S. 96, 106, 15 L.Ed. 557; Todd Protectograph Company v. New Era Manufacturing Company, D.C., 236 F. 768.

In the trial of a cause, any fact bearing upon the issues involved admitted by counsel may be the ground of the court's procedure equally as if established by the clearest proof. Oscanyan v. Arms Company, 103 U.S. 261, 278, 26 L.Ed. 539, but the attorney for appellee in the case at bar expressly declined to abandon the claims not declared on.

In our opinion this was not a binding admission that the claims not in suit

were invalid. Union Trust Company v. Southern Sawmills & Lumber Company, 4 Cir., 166 F. 193; L. P. Larson Jr. Company v. Wm. Wrigley, Jr., Company, 7 Cir., 253 F. 914.

 The trial court refused the request of counsel for appellant to rule on the validity of the claims of the patent not declared. A consideration of the evidence makes applicable the rule that an inspection of the patent by the patentees or their assignee would not have disclosed they had claimed more than they had invented or described. They had the right to rely on the presumption of the validity of their claims granted by the patent office until a court of competent jurisdiction decided that their claim or claims were broader than their real invention. Ensten v. Simon, Ascher & Company, 282 U.S. 445, 458, 51 S.Ct. 207, 75 L.Ed. 453; General Chemical Company v. Standard Wholesale Phosphate & Acid Works, Inc., 4 Cir., 77 F.2d 230.

The decree of the District Court is affirmed.