## INDUSTRIAL MODELS CORPORATION
### v. LOEFFLER et al.
#### No. 4628.

District Court, E. D. Michigan, S. D.

Sept. 21, 1946.

Woodruff B. Cram, and Thomas S. Donnelly, both of Detroit, Mich., for plaintiff.

Lawhead, Kenney & Radom, and Arthur W. Dickey, all of Detroit, Mich., for defendants.

LEDERLE, District Judge.

### Findings of Fact.

1. This is a suit for the infringement of claims 5–11, inclusive, of Stewart patent No. 2,189,154. The answer disclosed that the defendant, Loeffler Pattern Company, is a co-partnership consisting of Albert Loeffler and Edwin Charvonneau. With the consent of counsel for the defendant, the complaint was amended to name the co-partnership and its individual members as defendants, and counsel for defendant undertook the defense on behalf of all defendants.

2. The application for the patent in suit was filed February 16, 1935, and allowed with 4 claims on February 16, 1938. The patent was permitted to forfeit but on February 14, 1939, an application for renewal was filed. None of the claims allowed on February 16, 1938, is involved in this suit. Claims 5–11 were added either with the application for renewal or subsequently thereto.

3. The specifications disclose methods for making duplicate models of plastic and reinforcing materials. The duplicate models are extensively used in the automotive industry as templets on profiling or Keller machines. They may also be used for most of the purposes for which the original model was intended. It is desirable to have light rigid duplicate models so that they can be easily handled and transported from place to place without too much danger of breakage. The original models are ordinarily made of mahogany by highly skilled workmen and are rather expensive. The duplicate plaster models can be made by unskilled or semi-skilled labor and are very cheap. When the original wooden model is used on a profiling machine, it is sometimes damaged by the guide spindle of the profiling machine. The relatively hard surface of the plaster duplicate model is practically impervious to such damage. It is also sometimes advisable to have several duplicates of the wood model for use on different profiling machines and in various departments of the plant at the same time for visualizing, hammering out, grinding and other uses. The relatively cheap method for making these duplicate models is extremely valuable in the die making industry.

4. The patent drawings of necessity disclose in outline the original wood model. Reference to the specification clearly discloses the part of the model which is made of reinforced plaster.

5. The patentee succinctly explained the principal value of his alleged invention in the following language:

"Another object of the invention is to speed up production by affording a means for quickly and inexpensively making a large number of reproductions of a pattern of the section or part section as may be required instead of being required to use only the wood pattern."

He could have described his inventive concept in substantially the following language: "I have discovered that a duplicate of a wooden model, which will be inexpensive to manufacture, light and durable, can be made. This can be done by substituting reinforced plastic material for the wood commonly used and mounting it on legs substantially the same as the wooden model is mounted." It was un-

necessary to explain how the reinforced plastic material could be worked into shape, for that practice was well known in the plaster art for at least fifty years prior to 1935. Indeed, the method of making the plaster model disclosed is substantially the same as the methods some birds use in building their nests.

6. A substantial part of the specifications merely describes the methods for using any model in connection with a profiling machine and the merits of the patentee's device as compared to other devices in use at that time.

7. None of the claims in suit specifically refer to a duplicate model made of plaster. Claim 6, which is typical, reads as follows:

"6. A profiling machine templet comprising a templet body having a contact surface on one side thereof; supporting legs secured to and projecting outwardly from the opposite side of said body; and a supporting frame attached to said supporting legs and fixed relatively to said body."

All of the claims in suit are so broadly drawn as to read on the original model as well as any duplicate of such model made of any material.

8. In defendants' proposed findings of fact they describe the models produced by them as follows:

"4. The templets made by defendant and charged to infringe the patent in suit are constructed of plaster. The outer or tracing surface of these templets is composed of hard plaster from one-half of one inch to one inch. The under body of the templet consists of a plaster mixed with hemp fiber before it is applied to the underside of the contact layer, and it is from 2" to 3" thick. Supporting legs are attached to the under body of the templet and are made of plaster mixed with hemp fibers and are rolled to desired shape while the plaster is soft. Inner ends of each leg are worked into the soft plaster of the under body and the outer ends are worked over the ends of nails secured in a wood frame. This wood frame is usually rectangular in shape and is adapted to be

clamped to the face plate of the duplicating machine."

9. It is obvious that these devices infringe if the claims in suit are valid, for the reason that they are duplicates of the original models and the original models read on these claims.

Counsel for plaintiff frankly conceded that the claims in suit are too broad but contended they should be construed in the light of the specifications in order to preserve the patentee's real invention. He likewise conceded that the patent would not include a duplicate model made in accordance with the teachings of the patent when the legs were of such length as to establish the car line position even if such a model was adopted for use on a profiling machine. It is well to note that in the patent office this same attorney argued that one of the principal advantages of the Stewart device was that the legs maintained the model in a car line position.

10. In order to use a pair of dies in a stamping operation it is important that the punch (male or convex) part of the set be fixed in the press at the same angle as the die (female or concave part). In modern complex stamping more than one set of dies is necessary for each stamping. A modern automobile fender requires as many as 10 separate different sets of dies. Each set of dies must be set at an angle so that they will mesh perfectly. With simple dies the proper angle may be determined by the designing engineers and specified with the drawing. In case of the more complicated dies the proper angle must be determined by experimentation, or the system of "trial and error."

There is nothing in the patent that teaches how to determine this angle. Mr. Stewart, the patentee, was a witness, and he frankly stated that he knew of no way to solve this problem and depended upon others for his information as to how to get the proper angle.

The only reference to the die angle in the specifications is found in lines 27–31, column 1, page 2, which reads as follows:

"These legs also serve as supports for the plaster templet, holding it rigid and

preventing warping. They also establish the specified angle at which the die and punch are to be set and seemingly the legs vary in length."

This statement does not disclose how the specified angle is to be determined but merely defines the ordinary function of legs or supports. It would equally cover the legs on the original wood model or the legs on any other object so supported.

11. Claim 11 of the patent describes the original model as well as the Stewart duplicate in the following language:

"11. A profiling machine templet comprising a shell-like body having a working face; and supporting legs secured to and projecting outwardly from said body."

As Stewart stated, the reinforced plaster shell of his device is a substitute for wood shell used in the original model.

12. Counsel for plaintiff contended that the patent could be sustained if the court adopted a narrow construction based upon the theory that the real inventive concept disclosed relates solely to the angularity of the supporting means. In his brief he stated " * * * this angular extension, relative to the templet body, is believed embodied in the claims at least by implication. It is obvious that the patent does not cover any kind of a body with supporting legs projecting outwardly therefrom. If it did, it would read on a chair."

It is just as obvious that the legs of a chair establish the specified angle which the seat of a chair is to have in relation to the floor. In other words, rigid supports always establish the angle that the object to which they are attached has with relation to the object upon which it is supported. Lines 27–34, column 1, page 2 of the specifications merely describes the function of rigid legs attached to an object.

13. The duplicate models disclosed in the patent do have great utility and have met with marked commercial success when used on profiling machines. Prior to 1930 there was no substantial demand for such devices. The alleged invention appeared as soon as there was a demand for them and there is no evidence that anyone familiar with the plaster art had tried to meet this need and failed. To the contrary, neither Stewart nor Hudson Motor Car Company had any difficulty in producing the thin plaster models as soon as the die making industry needed them.

All three dimensional models must be supported on legs or the mechanical equivalent thereof in order to use them on a profiling machine. This method of supporting models on profiling machines was in common use prior to 1930. The following U. S. patents, not considered by the patent office at the time the Stewart application was under consideration, all disclose profiling machine models with supports which perform exactly the same functions as the supports disclosed in the Stewart patent:

Wesson 600,391, issued March 8, 1898;

Crane 703,719, issued July 1, 1902;

Richards 842,247, issued January 29, 1907;

Anderson 1,952,230, issued March 27, 1934, filed Aug. 1, 1927.

14. The art of constructing thin shell-like plaster models built up in the manner disclosed in the specification of the patent in suit was practiced for at least fifty years prior to 1930. It was also common practice in the plaster art to attach such plaster casts to rigid supports or legs. This patent does not disclose anything new as to such a combination.

15. Prior to 1930, while the dies used in making stampings were relatively simple, there was no substantial need for shell-like plaster duplicate models for use on profiling machines. The original model was used for the male portion of the die and the solid plaster models reinforced to serve the purpose for the female portion. When it was desirable to reduce the weight of the solid models this was accomplished by constructing them with hollow cores. These solid or semi-solid models were made by employees having no specialized knowledge of the plaster art.

It was unnecessary for anyone needing a plaster cast duplicate to do anything other than employ a mechanic skilled in the plaster art to construct such a duplicate model. That is exactly what the Hudson Motor Car Company did. In 1931, when

694

this company desired to make a more extensive use of plaster models, a plasterer was employed and he immediately started to make plaster models substantially the same as those disclosed in the Stewart patent.

16. There is no invention disclosed in any of the claims involved in this suit.

### Conclusions of Law.

■ 1. This is an action arising under the patent laws of the United States and this court has jurisdiction to hear and determine the issues raised by the complaint. 28 U.S.C.A. § 41(7).

■ 2. The usual presumption of validity arising from the granting of the patent in suit is weakened in this case because the patent office did not have its attention directed to the most pertinent prior art. France Mfg. Co. v. Jefferson Electric Co., 6 Cir., 106 F.2d 605.

■ 3. When the validity of a patent is challenged it becomes the duty of the court " * * * to ascertain just what it was that [the patentee] did that had not, in essence, been done before, and whether it denoted invention or [whether it] was within the expected routine skill of those laboring in the art." Seiberling Rubber Co. v. I. T. S. Co., 6 Cir., 134 F.2d 871, 873.

■ 4. The claims in suit do not disclose a new combination. All of the elements of the duplicate models disclosed perform the same functions in the same manner as the similar elements in the original model. These specifications of the patent clearly show that all the patentee did was to substitute a thin plaster cast for the similar wooden portion of the original model. "Such improvement was advance only in degree, and as such must yield to the rule, that a mere carrying forward of a new or more extended application of the original thought, a change only in form, proportions, or degree, the substitution of equivalents, doing the same thing in the same way by substantially the same means with better results, is not such invention as will sustain a patent." Seiberling Rubber Co. v. I. T. S. Co., supra. See also Detroit Gasket Co. v. Wolverine Fabricating & Mfg. Co., 148 F.2d 399; Id., D.C., 53 F.Supp. 966.

■ 5. Duplicate models made in accordance with the teachings of the patent in suit have achieved a degree of commercial success, but this is important only if the question of invention is open to doubt. When invention does not exist commercial success is immaterial. Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 6 Cir., 139 F.2d 473; Detroit Gasket Mfg. Co. v. Wolverine Fabricating & Mfg. Co., supra.

■ 6. Claims 5-11, inclusive, of Stewart patent No. 2,189,154 are void for want of invention.

7. Accordingly, a judgment is being entered simultaneously herewith, dismissing the complaint, with costs to be taxed in favor of defendants.