**CURTISS–WRIGHT CORPORATION and Richard C. Dehmel, Plaintiffs,**

**v.**

**LINK AVIATION, INC., Defendant.**

**Civ. No. 5917.**

United States District Court
N. D. New York.

Dec. 30, 1959.

Kramer, Wales & Robinson, Binghamton, N. Y., Morgan, Finnegan, Durham & Pine, New York City, for plaintiffs, Donald W. Kramer, Binghamton, N. Y., George B. Finnegan, Jr., Granville M. Pine, Thomas P. Dowling, S. C. Yuter, New York City, Orin R. Severn, Carlstadt, N. J., of counsel.

Hinman, Howard & Kattell, Binghamton, N. Y., Darby & Darby, New York City, for defendant, Clayton M. Axtell, Jr., Richard G. Stephens, Irving Kayton, Binghamton, N. Y., Floyd H. Crews, Morris Relson, Robert R. Keegan, New York City, of counsel.

BRENNAN, Chief Judge.

This is the usual patent infringement action requesting the usual relief. The problems involved therein are rendered difficult because of the complex nature of the inventions claimed and the machines involved. Plaintiff's devices principally contemplate an all-electrically operated blind flight airplane trainer as distinguished from pneumatically or hydraulically operated machines. The lengthy record is made up of evidence involving aeronautics, electrical engineering, aerodynamics and mathematics, the understanding of which taxes the capacity of

one untrained therein. Jurisdiction is based upon the provisions of the statute and is undisputed.

### The Pleadings.

The action was commenced by the filing of a complaint on December 16, 1955. It charged the threatened infringement by the defendant of three patents in that the defendant was engaged in the present manufacture of an infringing device to be completed and delivered to a purchaser in the future. An amended complaint was filed on June 20, 1957. This pleading asserted infringement and threatened infringement of ten specific patents by the same and other proposed machines.

An answer was served January 16, 1958 which denied the material allegations of the complaint and raised the issues of invalidity, non-infringement and license. Through the cooperation of counsel, certain pretrial orders were entered which restricted the trial to the issues involved in four separate patents and in some twenty-two claims thereof.

The action was brought to trial in December of 1958 and was completed in March 1959. Over 5,500 pages of testimony were offered and over 500 exhibits received. Lengthy briefs have been filed by the parties; oral argument has been made and the issues are before the court for decision.

### The Patents.

Set out below are the patents referred to by number and the numbered claims of each which are involved in this litigation. They appear in the order in which they were filed and in which they were litigated.

Patent No. 2,494,508, filed June 18, 1941, issued January 10, 1950. (This patent will be referred to as 508). The claims involved are numbered 11, 13, 19, 29, 32, 33, 35, 38 and 45.

Patent No. 2,366,603, filed December 20, 1941, issued January 2, 1945. (This patent will be referred to as 603). The claims originally involved are numbers 3, 25, 40, 52, 60, 62, and 101. Claims 60 and 62 were conceded to be invalid

during the trial and are therefore removed from the case. The non-infringement of claim 101 was also conceded.

Patent No. 2,475,314, filed November 25, 1943, issued July 5, 1949. (This patent will be referred to as 314). The claims involved are numbers 14, 42 and 46.

Patent No. 2,560,528, filed March 27, 1945, issued July 10, 1951. (This patent will be referred to as 528). The claims involved are numbers 24, 25 and 28.

It may be said generally that as involved here, the above patents and the claims in litigation here apply to and involve devices intended to be used in aircraft flight training.

Patent 508 is claimed to be a basic patent comprising a stationary machine in which are located controls simulating those found in an actual airplane. The movement of the controls by the trainee create electrical impulses which are transmitted and refined through electrical circuits and mechanisms to instruments similar to those in an actual plane. Said circuits and mechanisms are so interconnected, arranged and calibrated as to reflect upon the indicators the effect of the control movements made by the operator. In addition, there is a charting device which automatically traces the path over or along which the plane would proceed in accordance with the movement of the controls. This patent also contains apparatus simulating radio range signals which are operable to enable the trainee to determine his position as an aid to navigation.

Patent 603 generally is an improvement over 508 in its flight control mechanism and contains further refinements in aid of navigation through simulated radio signals.

Patents 314 and 528 have to do primarily with additional improvements or refinements of airplane navigation aids by the use of simulated radio signals.

Throughout the testimony, the machines involved are generally referred to by the plaintiff as "simulators" while the defendant seems to more often use

the designation of the machines as "trainers". The terms appear to have been used interchangeably and the devices are intended to afford ground training and experience to aircraft operating personnel whereby they may become familiar with the action of an actual airplane in its different attitudes in response to the operation of the controls. In general, they are land bound prototypes of actual airplanes responsive to the techniques of airplane operation and navigation.

### The Parties.

Plaintiff, Curtiss-Wright Corporation, is generally known as a manufacturer of airplane parts and related machines or equipment. It holds an exclusive license from plaintiff, Dehmel, to make use of the patents involved in its manufacturing activities except for certain rights retained by Bell Telephone Laboratories under the first three patents mentioned above. Under the license, first above mentioned, Curtiss-Wright has the right at its election to sue an infringer of the patents covered by the license and to join Dehmel as a party plaintiff in such a suit. The use of the designation "plaintiff" in this decision will be deemed to include both plaintiffs unless otherwise indicated.

Plaintiff, Richard C. Dehmel, is the record owner of the patents involved in this litigation and the inventor of the devices described therein. He is at present the Director of Engineering of the Electronic Division of Curtiss-Wright at Carlstadt N. J. His collegiate education included a Bachelor of Science degree from the University of California which included some study of mechanical and electrical engineering. He was employed by the Bell Telephone Laboratories from his graduation in 1927 until 1943, receiving a Master's Degree in Metallurgy from Columbia University and the degree of Ph.D. in Chemistry in 1936. His employment by Bell embraced the development and design of telephone apparatus and electrical circuitry. He was stationed at Los Angeles in 1937 or 1938 until the middle of 1941 where he was primarily engaged in the supervision of all area electrical circuit operation and development as applied to the telephone system. In July 1941, Dehmel was transferred to New York and assigned by his employer to work upon a "gun director" which had been designed by Bell and intended to assist in the aiming accuracy of anti-aircraft guns. He was sent by his employer to England in 1941 to deliver, test and demonstrate such a gun director. He returned to Bell Laboratories in the latter half of 1942 and continued to work in the general area of gun fire control systems until he joined Curtiss-Wright in 1943.

Dehmel early developed an interest in airplanes. He obtained a pilot's license and while stationed in California, he conceived the idea of an electrically operated flight trainer and started to develop his idea about January 1941. A model was built in Dehmel's home or workshop and was assembled upon a trial and error system. On June 18, 1941, Dehmel filed his application for the 508 patent here involved. A short time thereafter, he was transferred by Bell from Los Angeles to New York and the model, above mentioned, was brought to his residence at Summit N. J. It is apparent that the model was thereafter modified or changed as the result of experimentation and on December 20, 1941, Dehmel filed his application for patent 603.

The remaining two patents in suit, to wit: 314 and 528, were applied for on November 25, 1943 and March 27, 1945 respectively. Both of these dates are after Dehmel's employment with Curtiss-Wright and it may be fairly inferred that same were the result of further experimentation and research.

Defendant, Link Aviation Inc., is the successor to the business established in the 1920's by Edwin A. Link who was a pioneer in the airplane trainer industry. The business has been practically continuous since at least 1936. Link is the conceded manufacturer of the alleged infringing structure which is referred to as the E 600. This trainer or simulator was manufactured at Binghamton N. Y.

and both the manufacture and sale were completed by the time of the filing of the amended complaint.

The Controversy and Machines Involved.

The extremely technical nature of the proof offered, taken together with the technical language of the patents themselves adds to the layman's difficulty in appraising the specific points in controversy. Generally speaking, it is the plaintiff's contention that Dehmel was the first to conceive, disclose and reduce to practice an airplane trainer in which all operations and computations, starting from the control movements by the student through to the dial movements of the flight instruments, are affected and controlled entirely by electrical signals and electrically operated means. The claims in suit fall into two distinct categories. All of the claims of Patent 508, except claim 19, and all of the claims of Patent 603, except claim 25, are concerned with the attitudes of an airplane in flight. While the two claims, mentioned above, and all of the claims of 314 and 528 are concerned with the position of the plane as disclosed by simulated electrical signals finding their source from radio stations. In other words, both problems of flight control and navigation are claimed to be solved in plaintiff's patents. Since plaintiff asserts infringement of both the flight training and navigation aid claims, the litigation naturally divides itself into two parts. The controversy as it involves the flight training claims will be first considered.

The control of an airplane in flight is directed by the operation of an aileron, rudder, elevator, throttle and stabilizer. The operation of one or more of such controls by the pilot is reflected in the movement of the plane which is disclosed to such a pilot by the readings upon the affected instruments which are located upon a panel within his vision.

The Dehmel device contains controls and instruments which simulate those found in the actual plane. The movement of the controls sets off electrical impulses which are transmitted through intricate electric circuits and are altered through the action of potentiometers, rheostats, tachometers and electrically operated motors so as to produce upon the simulated instruments indications of the effect of such operations upon the flight of an actual plane. Inasmuch as the action of a control may have an effect upon more than one movement of the plane, the electrical mechanism is so interconnected as to ultimately compute the total effect upon a plane of any such movement and to disclose same upon the instrument dials. It is readily understood that the action of such mechanism involves the use of the techniques used in "computer machines".

It seems to be conceded that Dehmel made no patentable invention in the mechanical or electrical elements, above referred to. Potentiometers, motors, rheostats etc. were old in the electrical art and the use of electrical computers was known long before Dehmel. The concept of an entirely stationary trainer wherein the trainee must rely entirely upon instrument reading and·discard entirely any reaction which he might otherwise obtain together with the use of electrical means in computing and conveying the effects of control movements is urged as such a radical departure from the training afforded in prior instrumentalities as to justify findings of patentability and infringement. The contention must be weighed against the patent disclosures and must be rejected if Dehmel's disclosure appears in the prior art or if it is only the advancement of the prior art to be expected by the skill of those engaged therein. 35 U.S. C.A. § 103.

As indicated above, the claim of infringement is limited to the Link E 600, the history and structure of which will be briefly described.

The E 600 is an outgrowth of the trainer development program adopted by Link after the close of World War II. Electrical components and techniques had so far advanced during the war that it seemed advisable to adopt same in the

Link manufacturing operation. Although Link manufactured and delivered electronic computer type airplane trainers to the Government after the close of the war, the E 600 was the first electronic simulator built and sold to a non-government customer. It was a prototype of the actual plane known as the Convair 240 and was delivered to an organization known as Flight Safety Inc. in May 1956 and put to actual use at LaGuardia Field, New York City.

The E 600 was mathematically designed and built. A knowledge of certain characteristics of the Convair 240 was the actual starting point of the construction of the E 600. Aeronautical engineers then transposed such characteristics into aerodynamic equations of quantity or force and electrical engineers devised the electrical circuits, mechanisms and components which would compute the effect of such forces, or solve the equations. The whole process involves the skill and experience of those especially engaged in the manufacture of computer mechanisms. This is essential if accurate results are to be obtained. Although the E 600 is designed and built upon a mathematical background or approach which is entirely a different approach than that of Dehmel, the plaintiff contends that the mechanism involved in obtaining the ultimate result uses the same components as disclosed in Dehmel or their equivalents and therefore infringes.

### The Development of Trainers or Simulators.

It would seem advisable to refer briefly to the development of the art involved in this litigation in order to provide an understanding or background for the consideration thereof.

The manufacture of airplane trainers or training apparatus has developed into a major industry. This is shown by the fact that in 1957 the sales of such apparatus by Curtiss-Wright amounted to upwards of 18 million dollars. The complexity and refinements of present day trainers are evidenced by the increasing cost thereof but business economics dictate that such trainers are of practical necessity wherever men are taught to operate modern aircraft.

Link appears to have been the principal manufacturer of trainers prior to and perhaps through World War II. The early models of the Link device were built empirically. They were designed and built on a trial and error basis and as the result of experimentation. A principal feature of the Link devices was the movement of the chassis which was intended to simulate the movements of an actual airplane in flight and thereby transmit the sensations so created to the trainee. Such movements were responsive to the operation of the controls and the mechanism involved reflected the results principally through hydraulic or pneumatic mechanism.

The Dehmel devices, as disclosed in the patents, were also empirically derived. The response to the movements of the controls was shown however by variable electrical means in distinction to the hydraulic or pneumatic means used by Link. Another distinction or difference is that the chassis of the Dehmel device is stationary and the trainee must depend upon the reading of the instruments alone to ascertain the effect of the movement of the controls. In Link, the trainee depends upon visual changes and sensations produced by the motion of the chassis in simulating the different attitudes of an actual plane.

The modern approach in the manufacture of trainers may be termed mathematical or analytical. This approach seems to be contemporaneous with the development of mathematical computing machines which received an impetus in the early 1940's. As understood, this approach is outlined in the prior background description of the E 600. The modern trainer then becomes the prototype of the particular plane which it simulates. It may be readily concluded that the mathematical approach, described above, affords a more accurate and effective training instrument since each type of plane has its own characteristics

and will differ from another in its attitudes under the varying conditions to be encountered.

Prior to the advent of World War II, Curtiss-Wright did not build airplane trainers. Upon the advent of World War II, Link was frozen by a Government regulation and limited to the manufacture of trainers of the type previously made.

In 1940, Bell built the gun director, using computer and electrical techniques in solving the equations for aiming antiaircraft guns. About 1943, Bell manufactured electrically operated flight trainers under Government auspices. After the War, Link undertook a development program to adapt its business to the new techniques and its first electronic computer type of trainer was ordered by the Government on September 20, 1946 and delivered in 1949. Curtiss-Wright never manufactured a trainer built empirically or in accordance with the Dehmel patents. Its first sale was made in 1946.

### Invention.

An approach to the decision must necessarily rest upon an understanding and finding as to the bases upon which patentability rests. This question, ordinarily not too difficult, has become troublesome by reason of the lack of consistency in the evidence relating thereto, the language of the patents themselves and the various contentions advanced. A critical and detailed examination of the record, the documents and the briefs is therefore required.

Patentability implies invention which in turn requires novelty and utility. The approach to the conclusion of the existence of invention must be made with a comprehension of the problem to be solved, the state of the prior art, the extent of the advance therein, the result obtained and the usefulness thereof.

Broadly speaking, the problem was to simulate the attitudes of the plane in flight through grounded apparatus responsive to the action of simulated controls, such responsiveness being reflected upon simulated visible airplane instruments or dials. The result sought was to acquaint operating personnel with the actual behavior of a plane in flight and to familiarize them with the interrelated effects of the movement of one or more controls upon a plurality of responses. While economy in cost of the apparatus and the operation thereof were a consideration in the solving of the problem, accuracy and true simulation were overriding considerations.

The record is devoid of any considerable evidence of previous attempts to build an all electrically operated trainer with the exception of the Aerostructor, hereinafter referred to. The concept of such a machine was disclosed in the German Patent No. 568731 by Roeder as early as July 6, 1929. It can be fairly said that the fruition of the idea awaited the advent of the more intricate planes and the availability of electrical mechanisms capable of performing the computing functions required to show accurate results. The threat and actuality of World War II provided both the necessary impetus and materials required.

The usefulness of the Dehmel machine is open to serious question. Plaintiff contends that, even though no trainer has been built based upon his disclosure, his basic idea "opened the door to the modern mathematical analysis and design of electronic simulators". The argument is carried farther by the contention that the trainers made by Bell Laboratories during the war, the technique of which was later made available to the defendant, were actually disclosed by Dehmel and adopted by Bell. This contention lacks factual support. How much, if any, knowledge Dehmel drew from Bell's "gun director" and how much, if any, knowledge Bell drew from the Dehmel patent disclosures are not directly litigated in this action and is pure speculation on the record as it stands.

These patents are "means" or "apparatus" patents as distinguished from "method" or "process" patents. The file wrapper of 508 directs a change in title of the application by eliminating the

word "method" therefrom since no such claims appear in the case.

The use of electricity as the motive power or use of electrical connections and operating means in place of mechanical connections or means would not involve invention is also indicated in the file wrapper of 508 in rejecting certain claims. The statement follows—" * * Simply replacing mechanical connections and operating means with electrical connections and operating means as in Koster or Crane for actuating the indicators in accordance with control movement would not involve invention." It would seem to follow that the use of electricity and electrical components has been over-emphasized in the evidence, thereby losing track of the essential that their use to be patentable must produce a new or different result from that obtained by pneumatic or hydraulic power and mechanical connections and components.

Plaintiff Dehmel himself, in his testimony, indicates that multiple integrations and interrelationships between the electrical circuits are important items showing novelty or invention. Integration and double integration were known to the prior art. In fact, they appear in the Link C2 trainer but, more important, integration is not claimed as an essential step in the flight claims involved here. Interconnected electrical circuits were also old in the art and it is the court's understanding that same are a necessary part of any electrical computing device and has so been recognized long before Dehmel who claims no invention in the particular circuits disclosed in the specifications.

Dehmel's use of a stationary cockpit and simulated instruments is frequently referred to in the evidence and briefs. The fixed cockpit however is not an element of the claims involved which appear to be broad enough to apply to both a stationary and movable chassis. It is not understood that the item of simulated instruments is seriously urged as an essential item and no particular stress is placed thereon by plaintiff.

At this point it would seem advisable to briefly refer to the legal precedents which appear to hold in effect that the contentions as to integration, interconnected electrical circuits, stationary cockpit and simulated instruments, as disclosed, may not in themselves be considered as supporting invention. The claims define the limits of the patent. Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 277, 69 S.Ct. 535, 93 L.Ed. 672. Stated in another way as in Application of Berliner, 195 F.2d 918, 920, 39 CCPA 928—"The particular feature or fact upon which an applicant predicates patentability must not only be disclosed in the specification but also brought out in the claims". Cited with approval in Application of Wright, 256 F.2d 583, 45 CCPA 1005. Here, as in In re Rundell, 48 F.2d 958, at page 959, 18 CCPA 1290, there is nothing in the claims which call for particular electrical devices or particular operative connections by which the motors are controlled and the results disclosed upon the dial. Thus no invention may be claimed in the particular elements not disclosed in the claims. Although running counter to some of the contentions advanced in plaintiff's brief, he cites the 1952 amendment to 35 U.S.C.A. § 112, which applies only to combination claims, and the cases of Stearns v. Tinker & Rasor, 9 Cir., 252 F.2d 589 and Bryan v. Sid W. Richardson, Inc., 5 Cir., 254 F.2d 191 are cited, all of which indicate that he relies upon the result of a combination, rather than the novelty of a particular element.

An examination of the file wrappers in 508 and 603 does not clarify the court's understanding of just where invention rests. Claim 11 of Patent 508 is one of the broadest of the flight claims. It appears as Claim 87 as submitted to the Patent Office as a part of an amendment in 1945. Together with other claims, it was rejected as not properly defining the invention and as indefinite, ambiguous and inaccurate. We next find that the words "for ground training" were inserted in lines 1 and 2 and the claim was thereafter allowed. This court does not

pretend to understand the procedures of the Patent Office. but to say the least, it is difficult to comprehend how the addition of the three words, above referred to, which disclosed the purpose of the invention, can help in any way in defining the invention itself. In fact, the three apparently essential amending words do not appear at all in the flight claims of 603.

The reading upon the instruments reflects the direction and speed of electrically controlled motors and again referring to the file wrapper, it is plain that the use of an indicator to show the speed of a motor is not patentable invention.

It may be noted that in the brief submitted, it is at least intimated by the plaintiff that even conceding that Dehmel's concept of a wholly electrically operated trainer device was not new and that the components making up same and their interrelated action as a computing apparatus were long understood; that invention may be found in the selection by Dehmel of the "hardware" used in his device. Reliance upon B. G. Corp. v. Walter Kidde & Co., 2 Cir., 79 F.2d 20 is misplaced. In that decision, Paulson used specific metals in the elements of the structure of his device. Here the components of the Dehmel structure are described generally, not specifically, and the claims are replete with such terms as "variable electrical devices" and "electroresponsive means", thereby giving a choice of components to the practitioner.

It is beyond argument that Dehmel did not invent the physical components which he claims are the operable means of his device; neither did he invent the computer techniques which determine the result obtained. If invention is to be found, it exists in the arrangement and operation of the mechanism found between the controls and the instruments.

Approaching the question in a negative manner and by eliminating those features which were previously well-known and those not claimed, we arrive inevitably at the conclusion that the flight claims of the patents involved claim a combination of old mechanical and electrical elements so arranged and operated as to produce an improved result. If the claims are to be sustained, it must be, because " * * * of the fact of combination rather than the novelty of any particular element". Faulkner v. Gibbs, 338 U.S. 267, at page 268, 70 S.Ct. 25, 94 L.Ed. 62.

■ The test of patentability of a combination of old elements is so clearly laid down in the oft quoted case of Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, that repetition or discussion is unnecessary. To a great extent, it depends upon whether or not the result achieved is an improvement over prior mechanism. Improvement is a relative term and is determined largely by public acceptance or, in its absence, by expert appraisal. Evidence of public acceptance is lacking here and plaintiff's operating expert seems at best to go no farther than to say that the Dehmel device " * * * was as good and was maybe slightly better than the Link Trainer". Whether or not Dehmel's disclosure gave impetus to the advancements in the electronic type of trainer or whether they followed from the availability of materials and the know-how of mathematicians and engineers is a disputed question.

■■ The factual background hereinbefore stated brings us to an evaluation thereof and an application of the principles of law insofar as they pertain to the questions required to be decided in this litigation. The general rules of law relative to patent litigation are not in dispute here. The rules relative to presumption of validity, burden of proof and the case law construction of the patent statutes are not disputed and require no particular discussion. Whether Dehmel's arrangement of electrical and mechanical components, found between the controls and instruments, are such an advancement in the art as to constitute invention is an essential question. Even if same may be considered as an advance-

ment in the art, it must be of such a nature as to be beyond the ordinary skill of those engaged therein. Assuming that invention exists, it is not patentable if it was known or used by others in this country before the invention thereof by Dehmel. 35 U.S.C.A. § 102(a). The range of accomplishment to be expected of those skilled in the art and the question of prior use, last above referred to, are principally to be determined by the evidence offered in connection with a device known as the Aerostructor and same will be determined after a discussion thereof.

### Aerostructor.

The Aerostructor was a device intended to provide ground training for those interested in aircraft operation. The device consisted of a stationary chassis in which the trainee was seated and in a position to operate the simulated airplane controls. When so operated, the movement thereof actuated electrical impulses through various electrical means which were transmitted to be finally represented by the action of a motor which rotated an artificial photographic horizon so as to convey to the student, to whom the horizon was visible, an impression of the movements of a plane.

The device was the concept of one Travis and came to fruition through his own efforts and those of his two associates. Economy in the cost of manufacture and operation, together with a knowledge of electricity, prompted its use over pneumatic or hydraulic means to motivate the photographed horizon in accordance with the movements of the controls. The first model was constructed in 1939 and the early part of 1940 when it was displayed in the Museum of Science and Industry in New York City. Later models were developed and it is apparent that the construction time of same overlapped. In any event, one of said models was displayed for demonstration at the Luscomb Aircraft Agency in New York City during some part of the period from September 1940 to January 1, 1941. The models, above referred to, were empir-

ically constructed and it is readily understood that improvements were made as experience dictated.

That the Aerostructor, as a machine, existed prior to Dehmel and was operated by "variable electrical means" is beyond argument. It is also beyond argument that the device was intended to provide flight training by the use of a visibly rotating artificial horizon while the Dehmel device provided such training by the reading of simulated flight instruments. In other words, the Aerostructor was a visual trainer while Dehmel is dedicated to blind flight training. This distinction in purpose loses its importance because the controversy here involves the means for producing the results rather than in a distinction in the form of the results themselves. In one important respect, the history of both devices may be said to be similar. Neither concept produced a subsequent commercially successful airplane flight trainer.

We are then interested in the internal mechanism of the Aerostructor and the extent of its public use in order to determine whether or not Dehmel was anticipated thereby or whether or not Dehmel discloses a patentable invention over same. In view of the rule applicable to evidence as to prior invention or prior use, the evidence must be scrutinized as to the Aerostructor mechanism and the extent to which it was disclosed to the public prior to Dehmel. Anderson Co. v. Trico Products Corp., 2 Cir., 267 F.2d 700. We turn then to the evidence disclosing the history and structure of the Aerostructor device.

The first model of the Aerostructor, constructed and displayed as above, was apparently a crude device. It however afforded the basis for a patent application filed August 7, 1940. This application was continued in part by a subsequent patent application filed December 15, 1942. A British application, similar thereto, was filed October 12, 1943 and a patent issued thereon on May 23, 1946.

In the meantime Aerostructor device No. 2 had been constructed and displayed at the Luscomb Agency, as above indicat-

ed. The time of the completion of the construction of Aerostructor machines, models 3 and 4, does not clearly appear. They had been completed by June 1941 and did not differ materially from the model displayed in the New York show room in the latter part of the year 1940. Sometime apparently in the latter part of the year 1940, a trailer was purchased for convenience in conveying the Aerostructor for display purposes. In the winter of 1940–1941 and extending into the spring thereof, the Aerostructor device was exhibited in several places and in February 1941 an article concerning the device appeared in a magazine known as "Air Facts". During the period, above mentioned, the device was exhibited to government officials at Washington. It was used for some three weeks at Floyd Bennett Field. It was exhibited to the Canadian Air Force at Ottawa, Canada. It was demonstrated at the Flushing Airport, at the Teterboro Airport and at Valhalla. The device was also tested by the military at Randolph Field, Texas, and at Tulsa, Oklahoma. Such demonstrations were essentially negative in their results insofar as obtaining orders or contracts for the construction of the device is concerned. The Navy, however, indicated a definite interest therein for the purpose of teaching aerial gunnery. To exploit such interest, a change was made therein which principally consisted in photographically imposing a simulated target upon the rotating artificial horizon, the operating mechanism of which remained substantially unchanged.

By requisition, dated June 12, 1941, the Navy ordered two items or devices described as "Item 1", "Aerostructor, Model K1" and "Item 2", "Aerostructor, Special Gunnery Model, which is essentially an extension of the principles utilized in Item 1". Thereafter the manufacturers appeared to consider the device for gunnery training as a separate instrument which was called the Gunairstructor. The devices, called for in the requisition, were delivered on May 3, 1942 and further contracts led to the production of about 500 Gunairstructors during the war period.

Emphasis upon the construction of the Gunairstructor led to differences among the three persons who conceived, financed and built the original Aerostructor device. At the conclusion of World War II, all manufacturing ceased and the principals involved apparently lost interest in further perfecting or manufacturing either device and the United States patent applications, referred to above, were abandoned. The above statements are made because the circumstances and the abandoned applications indicate a lack of motive to exaggerate or to color the witnesses' oral testimony as to the concept and the structure of the device above referred to. It is very evident that the personal relationship of the above three persons tended to destroy any inference of collaboration in the matter of their testimony as given in this action.

The above history is important only if the Aerostructor, as conceived, manufactured, displayed and sold, contains such a disclosure of electrical components and their operable action as to constitute an item of prior use or as to constitute an anticipation of Dehmel. In this respect, an appraisal of the electrical components is difficult by one lacking skill in the art. It should be first stated that the circumstances afford no reason to consider the evidence relating thereto at anything other than the best effort of the witnesses to present the facts in a truthful manner. The passage of time alone and its effect upon the memory of the witnesses is the only detracting circumstance.

The witness, Polhemus, who testified upon the trial, gave every indication that his testimony was entirely trustworthy and same appears to be corroborated by documentary references. We can start with the fact that this particular witness, with only a high school education, appeared to find no novelty in 1939 in the use of electrical means to summarize the effect of the movement of simulated airplane controls. The Aerostructor contained interconnected electrical circuits,

potentiometers, electrical means and resistances which control the operation and speed of reversing motors. The operation of such means accomplished integration of the effects of the movements of the controls. Fundamentally, it combined electrical and mechanical means so as to give visual evidence of the control movements to the trainee. The Aerostructor accomplished in a visual manner with imperfections the same thing that Dehmel accomplished (also imperfectly) except that in the case of the Aerostructor, the result appeared upon a moving horizon while in Dehmel the result appeared in the simulated airplane instruments.

A detailed comparison of the combined elements and the method of operation found in 508, 603 and the Aerostructor requires lengthy discussions unnecessary to this decision. It is sufficient to conclude that the Aerostructor contained combinations similar to those found in the claims in dispute here and that means of operation were similar, as were the results obtained.

The oral proof offered beyond that summarized in the description of the Aerostructor, above, need not be further elaborated. It is, however, important that same be fortified by contemporary physical evidence. Such evidence exists here. The patent applications and the British patent afford such corroboration especially since Fig. 9 in each, which is a diagram of electric circuits and components, seems to be substantially similar in each document. The Air Facts article, the pamphlet outlining the operational procedure, the photographs and the diagrams, prepared for the use of the patent attorney, are likewise corroborative as is the application previously referred to.

The conclusion is inescapable that the Aerostructor was an actual electrically operated airplane training device, conceived, built and displayed to the public prior to Dehmel.

The technical procedural objections, raised by the plaintiff, to the evidence relative to this subject, do not appear to be substantial. Plaintiff shows no prejudice and the evidence will be received and given the weight and effect to which it is entitled.

Plaintiff's contention that the electrically operating means were foreclosed from public view and inspection is likewise rejected. Reliance seems to be placed upon the following testimony referring to the Luscomb showroom display—"Yes, people came in, as I say, off the street and ran it all the time. Lots of people wanted to know what was in it. We put this lock on it afterwards to keep people from opening it all the time to see what made it tick". The above indicates a free and open public inspection prior to the lock being placed thereon and, taken together with the evidence of demonstration, use and sale above referred to, constitutes public use within the meaning of the statute. Armour & Co. v. Rath Packing Co., D.C., 154 F.Supp. 54.

Defendant urges that the Aerostructor should be considered as an item of prior art which anticipates the claims of Dehmel or invalidates them for lack of invention. Reliance is based upon the decision in Alexander Milburn Co. v. Davis, 270 U.S. 390, 46 S.Ct. 324, 70 L. Ed. 651, to avoid the holding in Interurban Ry. & Terminal Co. v. Westinghouse Electric & Mfg. Co., 6 Cir., 186 F. 166 to the effect that an abandoned patent application cannot anticipate. The particular facts here, together with the fundamental rule that the patentee must be the first inventor, lends force, at least equitably, to the contention but such a decision as in Monarch Marking System Co. v. Dennison Mfg. Co., 6 Cir., 92 F. 2d 90 is highly persuasive that the rule of the Interurban case is still the law and if change is to be made therein, an appellate court may more appropriately decide.

The Aerostructor may be used however in determining the skill of the art. Wilson Athletic Goods Mfg. Co. v. Kennedy Sporting Goods Mfg. Co., 2 Cir., 233 F.2d 280 and as an invention known or used by others in this country

before the Dehmel disclosure. 35 U.S.C.A. § 102(a). The abandoned patent is likewise available as evidence of disclosure of the Dehmel invention. United States Blind Stitch Machine Corp. v. Reliable Machine Works, Inc., 2 Cir., 67 F. 2d 327.

The facts as to the concept, embodiment and use of the Aerostructor are so similarly comparable to those disclosed in the decisions of Smith v. Hall, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049, affirming 2 Cir., 83 F.2d 217 as to require a finding that any invention found in the flight claims of Patents 508 and 603 are not patentable under the provisions of the statute referred to above. Both devices simulated by electrical means the effect of the operation of airplane controls. If invention is found in one, it exists in the other. Both machines had their imperfections with a consequent lessening of usefulness. Both machines used electrical components long known in the art and the structures were subject to a variation of electrical components as experimentation dictated. Neither machine wholly solved the problem of complete and true simulation. Success in the particular field is relative. Neither became commercially successful but same is not essential if invention exists. Smith v. Hall, supra, 301 U.S. at page 233, 57 S.Ct. at page 718. The Aerostructor was most certainly both known and used as the terms appear in the above statute. Its many public displays and demonstrations with a testing or measuring of the results, constitute both knowledge and use. It would be naive to conclude that the Navy placed its requisition without knowledge or experience. It may also be said that the electrical operating structure of the Aerostructor became commercially successful in the form of the device known as the Gunairstructor.

This court finds that the Aerostructor antedated Dehmel whose invention was known and used by others in this country and in public use or sale therein more than one year prior to the Dehmel appli-

cations and that the flight claims of Patents 508 and 603 are therefore invalid.

It would seem to follow that the claims are also invalid in that they fail to reveal creative genius. Such is a requirement of patentability. Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, at page 91, 62 S.Ct. 37, at page 40, 86 L.Ed. 58. The concept of such a machine was known long prior to Dehmel. Its reduction to practice awaited the suitable materials rather than creative genius. If the builders of the Aerostructor could, without extensive experience or specialized education except that obtained in a technical high school, so arrange electric circuitry, potentiometers, rheostats, and available electrical components so as to show even in an imperfect manner, the effect of the movement of the controls upon an artificial horizon, the substitution by Dehmel of dial instruments for the horizon would seem to be well within the expected skill of the art. For this reason also, the claims are found to be invalid.

Vagueness and Indefiniteness.

The defense that flight simulating claims of the 508 and 603 patents are vague and indefinite becomes more impressive upon a review of the evidence relating to the language of the claims involved and their application to the structure of the infringing device. The defense is based upon the statutory provisions which require that each claim shall particularly point out and distinctly claim the subject matter which the applicant regards as his invention. 35 U.S.C.A. § 112. The problem involves an understanding of those skilled in the art to be appraised and applied by one unskilled therein. To state the problem is to disclose the difficulty. This is especially true where the patent application was pending over a period of years during which the science of electronics probably had its greatest advancement and during which also the patent claims were amended in a manner which must have reflected the advancements in the art. The court is aided by judicial de-

cisions and our Circuit, having recently discussed the subject at some length in the case of Georgia-Pacific Corp. v. United States Plywood Corp., 2 Cir., 258 F.2d 124, it would seem unnecessary to refer to precedents other than those cited therein. Each claim involved must disclose a structure which, when read in the light of the specification, will enable one skilled in the art to construct same without experimentation.

Turning now to the claims involved here, we find that they are replete with such terms as "responsive to", "operated by", "controlled by", "operably responsive", "operably connected", "electromechanically interconnected" etc. Each of the terms appears to speak in terms of function rather than in terms of structure. They indicate what is done by the elements rather than how it is done. The use of such terms are not to be condemned in themselves but they "call for no particular type of association", (Application of Wright, supra, 256 F.2d at page 589), and are vulnerable to the contentions that the claims using same are indefinite, too broad, and that they overclaim the invention. Each patent claim would seem to present its own particular problems.

■ The difficulty encountered here is pointed up in testimony as to the meaning of certain of the above terms. The substance of plaintiff's own testimony as to the meaning of "operatively connected" is that it is directly connected but it does not necessarily mean a direct connection. Plaintiff's expert, in defining and applying the terms indicating responsiveness as found in the claims, stated that there was no formula that the court could use and that the words might mean a responsiveness occasioned by a direct, single connection or that which occurs indirectly after the use and action of any number of remote interconnected devices. In substance, the witness states that the terms must be understood and applied with enough elasticity so as to meet the particular circumstances encountered. The ele-

ment or item referred to in the claims as a servo-motor is troublesome in its meaning and application. The term, like others discussed here, is not defined in the specifications. It first appears in the amended claims of 508 filed April 17, 1945. Plaintiff defines the term as a "control motor" which would apparently supplement a primary motor or control. Plaintiff's expert testifies that while the term lacked specific definition prior to 1943 that thereafter it was understood in the art as a motor whose output was fed back thereto through a feedback loop or negative feedback. Defendant's expert witnesses agree with that definition but they assert that the term always was understood in the art as embodying the negative feedback mechanism. In any event, after 1943 the term was so defined and understood in the art. This seems to be confirmed by the language and drawings of Patent 314 in which plaintiff uses the term servo-motor and indicates that same embodies such a feedback loop. The term, as used in claims under discussion and disclosed in the mechanism, is applied to motors having no such mechanism. It would seem to follow that either the term is misdescriptive or indefinite. The term "variable electrical devices" is as limitless as the electrical art itself. It includes, according to plaintiff Dehmel, such items as a rheostat, potentiometer, cam relay, motor, meter or light switch. "Variable electrical means" and similar expressions must be likewise interpreted. Broadly interpreted and applied, the claims, containing the language discussed or referred to above, would seem to pre-empt the field of electrically operated airplane flight trainers. Such a result cannot be reconciled with the statutory particularity required of patent claims. An element in a claim may be expressed as a "means" (35 U.S.C.A. § 112) but if so expressed, the specifications must describe the structure (Stearns v. Tinker & Rasor, supra, 252 F.2d 597). A study of the specifications does not help; they speak in terms of function rather than of structure. Claim

11 of Patent 508 is illustrative of the claims involved.

*"Clause No.* 11. In an aircraft training apparatus for ground training to indicating and controlling one or more simulated flight conditions, the combination of

1. a plurality of manually operable control members corresponding to those of an actual aircraft operable conjointly to produce said conditions,

2. an electrical motor,

3. a flight condition indicator operably responsive to said motor,

4. a plurality of variable electrical devices for controlling the operation of said motor, certain of said variable electrical devices being operatively connected respectively to certain of said manually operable flight control members for individually adjusting said variable electrical devices,

5. a servo-motor operably responsive to at least one of said flight control members,

6. and an operative connection between said servo-motor and at least one of said variable electrical devices for adjustably operating the same."

Here we have (1) aircraft controls; (2) an electrical motor; (3) a dial which responds to the action of the motor; (4) electrical devices which control the motor and are connected with the aircraft controls for their adjustment; (5) a servo-motor which responds to one or more of the controls; (6) a connection between the servo-motor and some adjusting electrical device. There seems to be no disclosure of an essential relationship between the elements. Application of Wright, supra, 256 F.2d 589. The dial may respond to the motor and the servo-motor may respond to the controls either directly or remotely after any number of refinements or alterations. It may be that the servo-motor contains a feedback mechanism or is simply any auxiliary motor of any type providing a supplementary measure of control. The operative connection referred to in clauses 4 and 5 may mean any type of connection capable of conveying operative force or nothing at all. In re Fessenden, 56 F.2d 669, 19 CCPA 1048.

Claim 13 seems to differ from Claim 11 principally in that it provides for a plurality of servo-motors. Claim 29 refers to and depends upon "voltage deriving means" and "electro-responsive means" which may be defined like "variable electrical devices" as being limited only by the skill of the art. They, like the word "controlled" as used in the claim, are so broad as to be indefinite and are functional rather than structural.

Claim 32 embodies responsiveness and the discussion of Claim 11 would apply. Its indefiniteness appears in its applications both to the patent and to the alleged infringing device.

As far as Claims 33, 35, 38 and 45 are concerned, the same similar terms, referred to in the comment on Claim 29, are found therein. In addition, the statement of responsiveness is found in Claims 33 and 45, the indefinite meaning of which has already been discussed.

Flight Claims 3, 40, 52 and 101 of Patent 603 need no individual discussion. Each contains terms similar to those discussed above.

The claims above mentioned, as interpreted and applied, leave such a "zone of uncertainty" (United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, at page 236, 63 S.Ct. 165, at page 170, 87 L.Ed. 232), which requires that they be found to overclaim the invention and to be vague and indefinite and therefore invalid.

### The Prior Art.

Some of the items urged as anticipating or disclosing the Dehmel combination will be briefly discussed.

The Link C–2 Trainer was manufactured by the defendant and in use in 1940 and prior thereto. Generally speaking, the C–2 was constructed and operated in accordance with the pre-war features of the Link trainer. It features a movable chassis responsive to the operation of the controls. This responsiveness was accomplished for the most part through pneumatic means and the results of movements of the controls were reflected in instruments or means observable by the operator. While the machine may be referred to by the layman as a pneumatic device, there were certain electrical components located therein which were a part of the operating apparatus but same do not invalidate the assertion that the device was operated primarily pneumatically. Further discussion of the C–2 is not required since it is understood that it is defendant's principal contention relative thereto that the flight claims in suit are vague, indefinite and invalid since they read upon the C–2 structure. It should also be noted that a Link patent, disclosing substantially the same type of trainer, was considered by the Patent Office in its processing of Dehmel patent 508.

The Roeder patent, issued in Germany on April 21, 1933, is entitled "Training Apparatus for Piloting of a Craft Which is Freely Movable in Space". The device, shown in this patent is operated through mechanical and hydraulic mechanisms. No electrical components are shown although it is suggested that "electrical means" may be used. The embodiment of the device shown in the patent appears to show a mechanism intended to afford training in the operation of airships (lighter than air) and Roeder goes on to state that no fundamental difference exists in the case of airplane training apparatus from the embodiment shown except that the "airplane pilot has a substantially larger number of control adjustments to make". Just what the adjustments are and how they are to be reflected for the education of the student is not disclosed.

Roeder does disclose in schematic form the interaction of forces of flight, all of which are capable of computation by mathematical formula by long known aerodynamic equations. In other words, he shows the mathematical approach to the building of an airplane trainer which was followed by the alleged infringing device rather than the empirical approach followed by Dehmel.

Roeder definitely did show an appreciation of the problem, a knowledge of the art of computing and a familiarity with aerodynamics. He also showed a knowledge of integration (Claim 2) and the existence of servo-motors (Claim 5) which are sometimes used in supporting the claim of invention in the Dehmel device. This patent however cannot operate as prior art or as an anticipation. A foreign patent to be anticipatory must be so clear as to enable a person skilled in the art to practice it without the necessity of making experiments. Carson v. American Smelting & Refining Co., 9 Cir., 4 F.2d 463; Becket v. Coe, 69 App.D.C. 51, 98 F.2d 332, at page 335; Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 2 Cir., 247 F.2d 343. No such disclosures appear here. Roeder conceived an idea involved here, but he did not practice it. He went no farther than to pose the problem and suggest a solution.

The Chedister Patent No. 2,341,312, filed March 7, 1941 and issued February 8, 1944, is a training device intended to acquaint trainees with the operation of automobiles. It is a visual trainer containing electrical components such as potentiometers, rheostats and electrically controlled motors, so arranged and interrelated as to indicate visually to the trainee the effect of the operation of the controls.

The Reymond Patent No. 2,080,186, filed July 25, 1934 and issued May 11, 1937, is entitled "Latitude and Longitude Meter for Ships". The device automatically records latitude and longitude as

same changes in accordance with the position of a moving vessel. It uses electrical components, potentiometers, motors and integrators, so arranged and interrelated so as to compute to the observer the result or effect of such movements.

 Other prior art patents, writing and texts, advanced by the defendants in the course of the trial, have not been overlooked. It is not necessary to discuss same at length here. Here they are collectively assembled and altered to disclose the Dehmel machine. The result does not constitute an anticipation. Block v. Nathan Anklet Support Co., 2 Cir., 9 F.2d 311; Davison v. Alexander Smith & Sons Carpet Co., D.C., 22 F. Supp. 461. The claims involved are not invalidated by the showing of the prior art here and this court repeats a statement previously made in Consolidated Car Heating Co. v. Chrome-Gold Alloys Corp., D.C., 109 F.Supp. 652, at page 655—

"The disclosure of prior art may not be gathered piecemeal from prior public disclosure and then combined in such a manner as to destroy subsequent invention."

The defense of invalidity by reason of the disclosures of prior art is not established.

### Infringement.

It might be sufficient to say that since invalid claims may not infringe that plaintiff has failed to establish this essential element of his cause of action. This facet of the case was so exhaustively tried and extensively briefed that it is deemed advisable to briefly discuss same assuming, for the purpose of the discussion, that the claims above referred to are valid.

 It can be said generally that the flight claims of 508 and 603 may be read literally upon the defendant's E 600 machine. Such readings are made possible by the great breadth given thereto and the elasticity of meaning attributed to the language. Even so construed and applied, such a "word by word correspondence is not alone enough". Grub-

man Engineering & Manufacturing Co. v. Goldberger, 2 Cir., 47 F.2d 151, at page 152. As in the above decision, an examination of the patent device and the E 600 discloses that they are unlike in detail. This is illustrated by the opposite arrangement of the pitch and roll mechanism implicit in claim 40 of 603 with a consequent different indication under given conditions.

The devices are built on two entirely different principles. Plaintiff's own expert testifies that in the E 600, there is a mathematical computation showing what occurs in an actual plane while in the 508 the apparatus is not designed or assembled along the lines of the equations of motions. Again plaintiff's expert testifies that the rationale of the computation process is entirely different in the two devices, and that the modes of computation therein are not directly comparable. The testimony, given by plaintiff's expert, illustrates the court's conclusion that the E 600 is so far changed in principle from the Dehmel device as to escape a finding of infringement. "The E 600, having been designed from a set of mathematical relations to begin with, have naturally followed a pattern conforming to the mathematical formulation of the problem. It could do no other. The 508 does not do that in the same way". It would seem unnecessary to further discuss the evidence on this point.

Plaintiff's contention as to infringement (including also the radio aid claims hereinafter discussed) seems to assume too broad a range of equivalents, including those old in the art, those not known at the time (Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, at page 13, 67 S.Ct. 6, at page 12, 91 L.Ed. 3) and to lean too heavily upon the identity of the result obtained. The different mode of operation is overlooked or ignored. Air Devices, Inc. v. Air Factors, Inc., 9 Cir., 210 F.2d 481.

It is concluded that the legal principles expressed in Westinghouse v. Boyden Power-Brake Co., 170 U.S. 537, at pages 568, 569, 18 S.Ct. 707, at pages 722, 723,

42 L.Ed. 1136 and in Grubman Engineering & Manufacturing Co. v. Goldberger, supra, 47 F.2d at page 153 are applicable and that plaintiff has failed to establish that defendant has infringed the claims under discussion.

### The Defense of Inoperability.

■ This defense is directed to the flight claims of the 508 and 603 Patents. It is based upon the contention that the machine disclosed in the Dehmel patent is so deficient in its operation as to compel a finding that it lacks the element of usefulness required in a valid patent. 35 U.S.C.A. § 101. Such defense is not established.

Defendant's proof rests primarily on the fact that no evidence is offered that any operable trainer was ever built which functioned according to the patent disclosure, together with evidence of actual imperfections in operation and deficiencies discerned by an expert engineer in his appraisal of the circuits, as the components would operate under assumed conditions.

Plaintiff produced in court a model of a machine constructed in accordance with Fig. 25 of the 508 Patent except for one electrical circuit shown in Fig. 32. That it functioned with imperfections cannot be denied. Movement of the controls was reflected in the dial instruments. Perfection was not achieved but there is affirmative evidence from experienced pilots that it was a useful device, at least for basic flight training, it being apparent that allowance must be made for the inadequacies therein.

■ Usefulness as required by the statute as an element of patentability is a relative term. It implies practicability as distinguished from perfection. The problem here was to produce a machine which would behave like a plane. Simulation both posed the problem and defined the result. An inventor seldom if ever achieves the ultimate in his machine. This is especially true where the object is to imitate the behavior of an entirely different mechanism. Faulty performance of the mechanism involved here more seriously affects the utility or usefulness than in the usual run of machines since "negative training" may result in serious consequences. However the demand of utility in the trainer of 1941 is entirely different than the utility and accuracy required in the modern trainer. Utility must be determined as of the date of invention. Present day requirements due to scientific advancement is not the test. Dehmel's machine satisfied the statutory requirement of utility since it afforded the means for blind flight training in some of its applications. The following quotation, taken from Freedman v. Overseas Scientific Corp., 2 Cir., 248 F.2d 274, at page 276 is applicable.

"An article invented may have patentable utility even though the patented device is not unfailingly operable in all its applications."

The defense, that the flight claims of Patents 508 and 603 in suit are invalid because they lack the statutory requirement of usefulness and are inoperable, has not been established.

### The Defense of License.

■ The defense that the defendant is free from liability by reason of a license held by it may be quickly disposed of.

Under an agreement, executed by Dehmel at the time of his employment by Bell Telephone Laboratories, he was required to assign to the employer all rights to inventions he might make which were related to his employment. It was determined that Patents 508, 603 and 314 were covered by the letter or spirit of the agreement. The employer apparently had no definite interest in such patents and by subsequent agreement, it relinquished its rights therein to Dehmel, reserving to itself a non-exclusive license together with "the right to grant to others a non-exclusive license to use and sell in all fields other than that of ground training; teaching and instruction of aircraft-operating personnel and for amusement purposes". Subsequently the defendant obtained the

right to use the above three patents in accordance with the non-exclusive license, above quoted, and it is urged that the infringing device, manufactured by it, is rendered immune from attack as an infringement for the reason that it is capable of use in fields outside that of ground training for aircraft-operating personnel. The contention seems to be invalid. The E 600 was designed for the training of aircraft-operating personnel. The literature, referring to that device, plainly indicates that such was its purpose. The device itself and the operating instructions, accompanying same, indicate that the E 600 is excluded from the license above referred to. It follows that the defense of license has not been established. General Talking Pictures Corp. v. Western Electric Co., 304 U.S. 175, 58 S.Ct. 849, 82 L.Ed. 1273.

### The Radio Aids Claims.

Claim 19 of the 508 patent; Claims 25, 60 and 62 of the 603 patent; Claims 14, 42 and 46 of the 314 patent; and Claims 24, 25 and 28 of the 528 patent are concerned with the simulation of aids to the navigation of planes which use radio waves or impulses as guides to determining position and flight path. Generally speaking, the flight claims previously considered are intended by the apparatus disclosed, to acquaint the trainee with the behavior of a plane in flight, while the radio aids are intended to afford him the means to determine its position while in flight.

Basically, the pilot determines his position from radio signals transmitted from ground stations, received, refined and indicated by apparatus within the plane itself. Complete ground training then requires a simulation of the signal producing means and the receiving and evaluating apparatus. The above radio aid claims here are directed to aspects of the above requirement. Plaintiff appears to concede that patentability of the claims involved rests upon improvements in the art rather than affording new concepts, the contention being that the claims show a combination of old elements which operatively produce improved results. The approach to the problem is then made with an appreciation of the difficulty in finding invention in such combinations especially in the absence of evidence that such claim disclosures have been used in any operating machine other than in the alleged infringing E 600.

Aerial navigation now uses a number of aids in meeting present day requirements. At least a basic understanding of the nature, makeup and mode of operation of those involved here is necessary and will be presumed. Detailed discussion will therefore be eliminated or will be reduced to a minimum and the language of the claims will be applied in accordance with its meaning in the art.

### Claim 19 of 508.

Borrowing the language of plaintiff's brief, this claim is the most comprehensive claim of all those in suit.[1] Same is interpreted as embodying in Clauses 1, 2 and 3 the complete flight training apparatus shown in the patent. Clauses

1. "19. In an aircraft training apparatus for ground training for indicating and controlling one or more simulated flight conditions and indicating the path of simulated flight, the combination of

 "1. an electro-mechanical translating system including a plurality of electrical circuits each having variable electrical means, certain of said electrical circuits being electro-mechanically interconnected for modifying current characteristics of one of said circuits,

 "2. a plurality of simulated flight controls each operating one or more of said variable electrical means,

 "3. means for indicating said path of flight including a plurality of electro-motive means operatively connected to respective of said circuits,

 "4. signal producing means for simulating signals of a radio range,

 "5. and control means for said signals operatively responsive to said circuits in synchronism with the operation of said electro-motive means to thereby control said signals in accordance with the said indicated flight path".

4 and 5 alone are concerned with radio aids. Clauses 4 and 5 recite no particular structure and not being limited to the structure disclosed in the patent would cover any and all signalling producing means in Clause 4 and any and all types of control means in Clause 5. The question of the validity of such a broad claim immediately arises. Signal producing means existed in the prior art, such as in the Link C–2 trainer. To control the signal by some means cannot be invention. The whole claim speaks of the results to be achieved rather than to the necessary apparatus. The words "in synchronism" in Clause 5 is interpreted to provide automatic operation which is stressed in plaintiff's brief. Additionally, several of the indefinite and elastic terms, referred to in the discussion of Claim 11 of the flight claims, are found here so that if the court is right in finding Claim 11 as vague and indefinite, the same finding is required here. Application of Wright, supra.

All the court can find in this claim is (1) a flight trainer; (2) a means to produce signals; and (3) signal control which operates in accordance with movement of the indicated flight path. It would seem to overclaim the invention if all items included in 2 and 3 above are prohibited under the penalty of infringement.

Unless the claim is applied in its extreme breadth and vagueness, it is not infringed by the E 600 since the A and N signals are produced by different means in the two devices. Additionally, the E 600 is not fully automatic in the operation of its simulated radio aid system. It is sufficient to say that this court finds the claim invalid and not infringed.

### Claim 25 of 603.

This claim is concerned with a simulation of the means which enables a pilot to visualize, by an indicator, his direction in flight with respect to two or more radio stations. The operation is not particularly complicated and substantially consists of two controllers which provide signals simulating those from two separate stations. The trainee "tunes" into the signals of one of the stations and adjusts his position control until the needle upon the visual instrument is centered. His position as to that station is thus obtained. The operation is repeated as to the second station and the pilot's location is thereby established.

The claim, which is set out below,[2] is open to criticism as to its vagueness and as to the functional statements contained therein. Application of Michlin, 256 F. 2d 317, 45 CCPA 1028. This charge is strengthened by defendant's contention that the language of the claim is misdescriptive or at least so ambiguous as to be misleading and therefore invalid.

The specifications of the patent recite that an important feature of the invention comprises a radio direction finder. Clause 7 of the claim refers to the orientation element of a radio direction finder.

2. "25. An emplaced apparatus for simulating the flight of an aircraft with respect to a plurality of radio stations, said apparatus comprising

"1. a traversing surface,

"2. a course indicating device adopted to be moved with respect to the surface,

"3. a plurality of simulated radio transmitting stations with respect to which said course indicating device may be traversed,

"4. a plurality of electrical circuits with

"5. means for selectively connecting each to a

"6. galvanometer responsive to said circuits,

"7. means simulating the orientation element of a radio direction finder, the movement of said orientation simulating means causing any selected one of said electrical circuits to modify the current to said galvanometer

"8. and an operative connection between said course indicating device and each of said electrical circuits whereby said selected electrical circuit will be caused to produce current flow in said galvanometer except when said orientation simulating means are moved to a position corresponding to the bearing or co-bearing between said course indicating device and said selected radio transmitting station."

The term "radio direction finder" is a word of art and conveys to the pilot information as to the angle between the plane's heading and the direction to the radio station. This angle is called "relative bearing". All parties agree that the above is the correct definition and function of a radio direction finder. It is undisputed that the apparatus in the claim under discussion provides "bearing" rather than "relative bearing". "Bearing" is the angle between a line north from the plane's position through a line from the plane's position to the radio station. "Relative bearing" and "bearing" or "true bearing" are two different quantities. Clause 8 of the claim produces the quantity described as "bearing". Defendant's contention may be summed up in the assertion that the claim, read in the light of Dr. Dehmel's testimony and the language of the specification, would lead one skilled in the art to believe that "relative bearing" would be a product of the apparatus referred to in the claim. The plaintiff's contention is to the effect that the term "radio direction finder" is used in the art in a more elastic sense than that given to it by the defendant; that the apparatus in fact provides "bearing" and that is the function claimed.

Misdescription or ambiguity are also urged in that in Clause 8 it is provided that there is no electric current flow when the instrument is at the null position. This is not actually correct. Apart from the precision in patent claims required by the statute, it is evident that in simulating a device such as is involved here, that there is no room for ambiguity in the teaching of a claim which has the potential result of negative training. Such training may have too serious a result to classify the apparatus as useful for the purpose intended. The claim is invalid.

Although an invalid claim may not be infringed, the contention will be briefly discussed.

The E 600 has a "radio direction finder" which indicates the conventional "relative bearing". In applying the claim to the infringing device, it is not applied to the "radio direction finder" but to that part of the apparatus which is referred to as VOR (Variable Omnirange). The operation of the VOR system need not be described in detail. It is sufficient to say that it is a radio aid facility which provides the quantity known as "bearing" and described above. The VOR apparently had not come into general use at the time of the filing of Patent 603. At least Dr. Dehmel did not at that time know of that facility and the contention is made that this claim is not properly applied to the VOR system in the infringing device since it was not known to the inventor at the time of the invention and therefore was not simulated by him. There is some indication in plaintiff's brief that the VOR facility had its beginning prior to Patent 314 but the record is silent as to whether or not the quantity of actual bearing was produced by that facility prior to Dehmel. If plaintiff's statement be correct, then it would seem that this claim may well have been anticipated. In any event, the decision in Air Devices, Inc. v. Air Factors, Inc., supra, is applicable. This court would hold that the defendant was within its rights in using the VOR as a part of its device and since he borrowed nothing from Dehmel, the claim may not be held to have been infringed. The court finds Claim 25 to be invalid and not infringed.

### Patent 314.

Patent 314 is entitled "Navigation Apparatus For Aircraft And Training Devices". Claims 14, 42 and 46 are the only ones involved in this litigation.

As indicated in the title, the subject matter of the patent relates to navigation apparatus operated to determine bearing angles relating to signal controlling and navigation. Among other purposes, it purports to be useful in actual flight and ground training. The patent preamble recites many claimed features but, as litigated here, it involves a more mathematical approach to the computing of electrical impulses and their resolution into indications of bearing and

range positions. It principally involves three classes of simulators,—a flight simulator from which the trainee receives flight indications upon the instrument dials. The flight simulator is connected with the position simulator which discloses the flight path taken and which in turn is connected with a radio simulator. The combination operates to control the signals and disclose same in accordance with the flight path.

Like the preceding patents, it is a combination of old elements so arranged as to produce an improved result. The elements are broadly described and the structures disclosed " * * * may be modified in various respects without departure from the broad spirit and scope of the invention * * * ". Precision of results are claimed from the automatic features and from the selection and arrangement of the parts and elements.

### Claim 14 of 314.

This claim embodies apparatus which receives and processes simulated radio signals and converts them to a form which will represent range and bearing of the station from the plane's speed and heading.

This claim, like all others, is drawn in general terms. Wide latitude in the identity of the components appears to be claimed so long as they perform the prescribed function. That the claim is uncertain or misdescriptive seems to be apparent from the testimony relative to the application of Clauses 6 and 7 (set out below)[3] of the claim.

Plaintiff's expert first applied Clause 6 to the scotch yoke device in 314. It developed that such mechanism responded only to the heading element and not to the speed element as required by the claim. The expert then applied Clause 6 to motors 68 and 69 but in order to

make the claim read upon the 314 patent, he applies the same motors to Clause 7. The expert's difficulty seems to arise in locating the "pair of members" moving according to the X and Y velocities of the craft, referred to in Clause 6. If the application is correct, then the motors would separately integrate their own motion as required in Clause 7. A fair reading of the claim would require that the means, referred to in Clauses 6 and 7, must be read as consisting of separate components. It follows that the claim is either vague or misdescriptive.

Referring to the question of infringment, the integrators, which plaintiff's expert testifies provides the means, referred to in Clause 7, have no moving members. Infringement can then only exist by a liberal use of the doctrine of equivalents. In a combination such as shown in this claim, no broad range of equivalents should be allowed. Additionally, Clause 6 is improperly applied to the E 600 since the arms of the potentiometer R 1A are not moved as required by the clause. The claim is invalid and not infringed.

### Claim 42.

Claim 42 is concerned generally with the same combination as in Claim 14. The preambles of both claims are alike. It is composed of seven clauses and the only specific component mentioned in any of them is a servo-motor referred to in Clause 5. It is directed to a radio range system which is disclosed in Figure 11 of the patent.

The claim is open to the charge of vagueness and indefiniteness by reason of the fact that it can be entirely satisfied by components which are limited in number only in the performance of the function prescribed. Supporting this contention is the testimony of plaintiff's own expert to the effect that he finds the

---

**3.** "6. means for operating said azimuth and range devices comprising a velocity resolver responsive conjointly to the heading element and the speed element for moving a pair of members in accordance with the components of velocity of the craft along x and y axes re-
spectively, of a reference Cartesian system,

"7. means for separately integrating the motions of said members with respect to time for determining the instant Cartesian position coordinates of the craft in said Cartesian system,"

claim to be ambiguous. This statement is made in connection with Clause 7 which is made to read upon Patent 314 and upon the E 600 in mechanisms other than the automatic scale change feature. The E 600 has no such feature and therefore would not infringe if that clause is so limited. A fair reading of the claims of this patent would indicate that Clause 7 is intended to refer to the scale change and to apply it otherwise is a strained and forced interpretation.

It follows that if Clause 7 is construed to cover the scale change, then there is no infringement. If it is construed to apply to other mechanism, then the claim is vague and indefinite, invalid and therefore not infringed.

### Claim 46.

Claim 46 purports to provide position data described as aircraft to station bearing. It is structurally similar to Claim 14. Clauses 1 and 2 of each are similar. Clauses 3 and 4 of Claim 46 are the same in substance as Clauses 6 and 7 of Claim 14 and are applied in substantially the same way to Patent 314. The fallacy in such application is discussed under Claim 14 and will not be repeated.

Infringement is not shown for the same reasons indicated in the discussion of Claim 14. Additionally, the claim is read upon the E 600 by elements of the RMI and VOR system incorporated therein. These facilities were not known to Dehmel and were not simulated by him. They may not be used to prove infringement for the same reasons that Claim 25 of 603 was rejected as reading upon the VOR of the E 600.

The claim is invalid and not infringed.

### Patent 528.

This patent, entitled "Training Means For Blind Navigating Systems", was issued July 10, 1951 upon an application filed March 27, 1945. There are but three claims involved in this litigation and insofar as pertinent here, they refer to an instrument landing system (generally described as ILS). The term is used to designate the specific system of electronic aids to an instrument approach to a landing point. Basically the ILS involves a localizer beam and a glide beam. The relative location of the plane to these beams is indicated upon instruments available to the pilot. The localizer beam guides the pilot in the proper direction toward the place of landing and the indicator will advise him when he strays to the right or left of the proper path. The glide beam furnishes vertical guidance to the landing point and the indicator shows the operator when he is above or below the correct angle of descent. Directional radio signals are transmitted which are received by apparatus located on the plane and thereafter translated into dial or instrument indications, visible to the operator.

The three claims involved here are related to the problem of simulating in a ground trainer the transmission, receiving and indication of such signals. Claim 24 relates only to the localizer beam but Claims 25 and 28 include the simulation of the glide beam. The distinction between Claims 25 and 28 is that 28 covers means for including the effect of wind to the system.

A principal contention arising in this litigation relative to the claimed structure and the infringing device (the E 600) seems to arise by reason of the fact that each litigant simulates a different ILS facility. The disclosure of Dehmel's claims show a system where the signals on both beams are constant in their intensity while the E 600 simulates the system presently used in an actual plane wherein the signals on both the localizer and glide path beams are intensified as the plane approaches the landing point. It may be that the Dehmel simulation was at one time recognized as a workable ILS but it is noted that there is no evidence which shows that such an arrangement was ever built into a commercially operable trainer and in fact the Curtiss-Wright trainers are built including the increased sensitivity feature.

Plaintiff appears to face a dilemma by reason of the above. If Dehmel attempted to simulate the modern ILS, then he

failed and the claims are inoperable. If his simulation was of an abandoned or obsolete ILS, then the claims lack utility. If the presently recognized ILS with its sensitivity beams did not exist or was unknown to Dehmel at the time, then it is obvious that such a system was not simulated. A valid patent must have utility at the time of the filing of the application. The record is not helpful in solving the questions posed above which go to the question of validity. There is no evidence as to when, if ever, the actual device, simulated by Dehmel, was considered as an operable ILS facility. There is however evidence that the device, as found in the E 600 was similar to that used in an actual plane and an actual landing field. The contention also involves the question of infringement since if Dehmel simulated what was recognized as a useful ILS and the E 600 only improved same, infringement is not avoided. On the other hand, if a new or different result was obtained by the added means, then the E 600 avoids infringement. To determine either problem, we must examine the patent and claims involved.

 Patent 528 is related to disclosures found in the 314 and 603 patents. Dr. Dehmel himself indicates that the novelty in 528 is contained in the electrical circuit which produces better results. It is apparent however that if invention exists, it is based in a combination of old elements which produce a new or different result. The circuit referred to by Dehmel is not disclosed in the claims. The claims themselves are broad and consist almost entirely of "means" apparatus with its functional apparatus. Infringement is based upon the application of the claims in such a broad manner as to constitute any electrical means capable of performing the function as a means of infringement. This is too broad. The construction of radio aids to navigation is a crowded art. Dehmel uses only old elements operating in their accustomed manner to produce a new result. The claims are not entitled to a broad construction and application.

The mere reading of the claims upon the E 600 does not determine infringement unless there is substantial identity of function, means and result. "The range of equivalents to be allowed cannot be extended to cover means which have clear antecedents in the prior patented art". International Harvester Co. v. Killefer Mfg. Co., 9 Cir., 67 F.2d 54, at page 61, cited with approval in Air Devices, Inc. v. Air Factors, Inc., supra. A mere glance at the schematic drawing of the operation of the two devices is indicative of non-infringement. Even assuming literal infringement, the E 600 solves a different problem; functions differently and produces a different result. Plaintiff's claim that the E 600 is simply an improvement over the claims here in litigation is rejected. The constant intensity beam of Dehmel and the relative sensitivity beam of the E 600 are two different species. It is not the constant intensity beam, whose performance is improved by the E 600 but rather it is one having the attribute of sensitivity which no improvement to the constant intensity beam could provide without changing the method of its function.

For the reasons above indicated, the E 600 does not infringe.

The above decision constitutes the Findings of Fact and Conclusions of Law herein pursuant to Rule 52, F.R.Civ.P., 28 U.S.C.A., and same are summarized below.

### Summary.

1. The court has jurisdiction of the parties to and subject matter of this action.

 2. Claims 11, 13, 29, 32, 33, 35, 38 and 45 of Dehmel Patent No. 2,494,508 and Claims 3, 40, 52, 60, 62 and 101 of Dehmel Patent No. 2,366,603 are invalid and not infringed.

3. Claim 19 of Dehmel Patent No. 2,-494,508 and Claim 25 of Dehmel Patent No. 2,366,603 are invalid and not infringed.

 4. Claims 14, 42 and 46 of Dehmel Patent No. 2,475,314 are invalid and not infringed.

5. Claims 24, 25 and 28 of Dehmel Patent No. 2,560,528 are not infringed.

6. The defense of inoperability as to the above claims is not established.

7. The defense of license as to the above claims is not established.

8. Judgment will be entered as above and the complaint dismissed with costs to the defendant.

9. Formal judgment as above will be prepared by the defendant and entered accordingly, and it is

So Ordered.